UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ )  |  |  |
| AMERICAN CIVIL LIBERTIES UNION, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Civil Action No. 08-00437 (RCL) |
|  | ) |  |
| DEPARTMENT OF DEFENSE, | ) |  |
|  | ) |  |
| CENTRAL INTELLIGENCE AGENCY | ) |  |
| Defendants. | ) |  |
| _____ ) |  |  |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Defendants, the United States Department of Defense (DoD) and the Central

Intelligence Agency (CIA), through undersigned counsel, respectfully move this Court for

summary judgment pursuant to Fed. R. Civ. P. 56 on the claims of the Plaintiff, the

American Civil Liberties Union (ACLU).

In support of this motion, Defendants refer this Court to the following materials,

which are being submitted concurrently with this motion:  (1) the Statement of Facts As to

Which There Is No Genuine Issue, (2) the Memorandum Support of Defendants' Motion for

Summary Judgment; and (3) the Declaration of Wendy M. Hilton.  As will be explained

more fully in these materials, there is no genuine issue of material fact in dispute, and

Defendants are entitled to judgment as a matter of law.

WHEREFORE, the Defendants respectfully move this Court for summary

judgment pursuant to Fed. R. Civ. P. 56.

Dated: June 30, 2008

Respectfully Submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
(D.C. Bar #418925)
Assistant Director

   /s/ James J. Schwartz
JAMES J. SCHWARTZ (D.C. Bar No. 468625)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7140
Washington, D.C.  20530
Tel.: (202) 616-8267
Fax: (202) 616-8202
Email: james.schwartz@usdoj.gov
Counsel for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
AMERICAN CIVIL LIBERTIES UNION,    )
)
            Plaintiff,              )
)
            v.                      )        Civil Action No. 08-00437 (RCL)
)
DEPARTMENT OF DEFENSE,              )
)
CENTRAL INTELLIGENCE AGENCY         )
            Defendants.             )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Director
JAMES J. SCHWARTZ (D.C. Bar No. 468625)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7140
Washington, D.C.  20530
Tel.: (202) 616-8267
Fax: (202) 616-8202
Email: james.schwartz@usdoj.gov

Attorneys for Defendants

## INTRODUCTION

Plaintiff in this Freedom of Information Act ("FOIA") action, the American Civil Liberties Union, seeks records from the Department of Defense (DoD) and the Central Intelligence Agency (CIA) regarding records related to the hearings of fourteen prisoners before the Combatant Status Review Tribunals ("CSRTs") at the U.S. Naval Base at Guantanamo, Bay Cuba. Complaint at ¶ 2 (D.E. 1). DoD and CIA have reviewed, processed and provided to plaintiff the requested documents. See Declaration of Wendy M. Hilton, Associate Information Review Officer for the National Clandestine Service of the CIA. ("Hilton Decl.") ¶ 13-20 (attached hereto as Exhibit A). In making its FOIA production, the CIA and DoD withheld limited information pursuant to well-recognized exemptions for protecting classified national security information, personally identifying information and information protected from disclosure by statute. The DoD and CIA's invocation of these exemptions was necessary and proper, as the detailed declarations submitted with this motion make clear. Defendants are, therefore, entitled to summary judgment on plaintiff's FOIA claim.

## BACKGROUND

On April 20, 2007, plaintiff submitted a FOIA request to CIA and DoD requesting documents relating to 14 High-Value Detainees (HVDs) currently in detention at Guantanamo Bay, Cuba. Hilton Decl. ¶ 9.[1] Each of the detainees had a hearing before the CSRT in Spring

---

[1]     The fourteen HVDs that are the subject of Plaintiffs' FOIA request are Abu Faraj al-Libi, Walid Bin Attash, Khalid Sheikh Muhammad, Ramzi Bin al-Shib, Ahmed Khalfan Ghailani, Mohd Farik bin Amin (known as Zubair), Mustafa Al Hawsawi, Abd Al Rahim Hussein Mohammed (known as Al Nashiri), Bashir Bin Lap (known as Lillie), Ammar Al Baluchi, Rjduan Bin Isomuddin (known as Hambali), Zayn Al Abidin Muhammad Husayn (known as Abu Zubaydah), Majid Khan, and Guleed Hassan Ahmed. Hilton Decl. n. 2.

2007.  Id.  Plaintiff's FOIA request, as modified, seeks unredacted versions of the CSRT hearing

transcripts and copies of all records provided to the CSRT by the detainees or their Personal

Representative.[2]  Id.  Prior to processing plaintiff's FOIA request, the CIA had already reviewed

and redacted 6 of the 14 transcripts in order for DoD to make them publicly available.  Id. ¶ 14.

The remaining 8 transcripts did not require any redactions.  DoD has made the six redacted and 8

unredacted transcripts publicly available through its website since August 9, 2007.  Id.

        In response to plaintiff's FOIA request, CIA re-reviewed the transcripts according to

FOIA standards and determined that the information reacted from the 6 transcripts could not be

publicly released as all the information is exempt from disclosure under both FOIA Exemptions

(b)(1) and (b)(3).  Id.  In its review, CIA made every effort to release as much information as

possible and, as a result, most of the six redacted transcripts are not heavily redacted.  Id. ¶ 22-

30.  Only one transcript has several pages redacted out of a total of 50 pages for that transcript.

Id. at ¶ 26.  One transcript has only one sentence redacted while another has only a portion of one

paragraph.  Id. ¶¶ 22, 25.  The remaining three transcripts only contain redactions on several of

their pages.  Id. ¶¶ 23, 24, 27.

        In addition to the CSRT transcripts, Plaintiff requested copies of all records provided to

the CSRT by the detainees or their Personal Representative.  Many of these documents, such as

prepared statements by the High Value Detainees, were read verbatim into the CSRT transcript

and thus subsumed in Plaintiffs first document request.  Id. ¶ 17.  By agreement of the parties,

CIA was not required to process any documents that were read verbatim into the CSRT

---

[2]  After consultation between the parties, plaintiff has agreed to drop its third request for documents - - copies of records provided to the CSRT by the Recorder - - and dismiss those portions of its complaint addressing that request.

transcript.  The CIA located 5 documents, totaling 13 pages, responsive to plaintiff's second

request that were not publicly available and not included in the CSRT transcript.[3]  Id. ¶ 18.  The

CIA processed these documents and released two in full.  Id. ¶ 19.  The CIA determined that

some information in the remaining three documents could not be publicly released as the

information is exempt from disclosure under both FOIA Exemption (b)(1) and (b)(3).  Id.  CIA

redacted those three documents and produced them to Plaintiff.  Id. ¶ 20.

## ARGUMENT

### I.    FOIA and Summary Judgment Standards of Review

The Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), "represents a balance struck

by Congress between the public's right to know and the government's legitimate interest in

keeping certain information confidential."  Center for Nat'l Sec. Studies v. DOJ, 331 F.3d 918,

925 (D.C. Cir. 2003) (citing John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989)

(quoting H.R. Rep. 89-1497, 89th Cong., 2d Sess. 6 (1966))).  FOIA requires each federal agency

to make available to the public a wide array of information, and sets forth procedures by which

requesters may obtain such information.  See 5 U.S.C. § 552(a).  At the same time, FOIA

exempts nine categories of information from disclosure, while providing that "[a]ny reasonably

segregable portion of a record shall be provided . . . after deletion of the portions which are

exempt under this subsection."  5 U.S.C. § 552(b).  Thus, while the FOIA requires agency

---

[3]      These five documents are: (1) a one-page diary excerpt of Abu Zubaydah; (2) a
two-page written statement of Khalid Sheikh Muhammad; (3) a seven-page written statement of
Hambali; (4) two pages of "Detainee Session Notes" prepared by the Personal Representative of
Majid Khan and entered into evidence at his CSRT hearing; and (5) A one-page written
statement of Bin Lap  responding to particular items of evidence.  CIA redacted information from
the statements of Khalid Sheikh Muhammad, Hambali and Bin Lap.  Hilton Decl. ¶¶ 18, 19.

disclosure under certain circumstances, the statute recognizes "that public disclosure is not always in the public interest." Baldrige v. Shapiro, 455 U.S. 345, 352 (1982).  The nine FOIA exemptions "reflect Congress' recognition that the Executive Branch must have the ability to keep certain types of information confidential." Hale v. DOJ, 973 F.2d 894, 898 (10th Cir. 1992), vacated on other grounds, 509 U.S. 918 (1993).  As the Supreme Court has stressed, the statutory exemptions must be construed "to have a meaningful reach and application." John Doe, 493 U.S. at 152.

In determining whether an agency has met its burden of justifying nondisclosure of information in a FOIA action, the district court must accord substantial weight to affidavits submitted by the agency in support of claimed exemptions.  5 U.S.C. § 552(a)(4)(B).  Indeed, as courts have recognized, in enacting the FOIA, Congress intended that courts give agency affidavits substantial weight in recognition of the agency's expertise, particularly in cases concerning questions of national security.  Gardels v. CIA, 689 F.2d 1100, 1104-05 (D.C. Cir. 1982); Assassination Archives and Research Center v. CIA, 177 F. Supp. 2d 1, 5-6 (D.D.C. 2001).

Accordingly, summary judgment is regularly granted in FOIA cases on the basis of agency affidavits.  Summary judgment is appropriate in a FOIA case unless the information provided by the agency is contradicted in the record or there is some evidence in the record of agency bad faith.   Gardels, 689 F.2d at 1104-05; Assassination Archives, 177 F. Supp. 2d at 5-6; Windels, Marx, Davies & Ives v. Dep't of Commerce, 576 F. Supp. 405, 409-11 (D.D.C. 1983).

II.     **The Defendants Properly Withheld Information Pursuant to the FOIA Exemptions**.[4]

    A.     **CIA Properly Withheld Information Pursuant to Exemption 1.**

As detailed in her declaration, Wendy M. Hilton, Associate Information Review Officer for the National Clandestine Service of the CIA, holds original classification authority at the TOP SECRET level and declassification authority pursuant to section 1.3(c) of the Executive Order 12958, as amended.[5]  See, e.g., Hilton Decl. ¶ 5.  Ms. Hilton has personally reviewed all of the CSRT transcripts and records provided by detainees or their representative to the CSRT that are at issue in this case, and has determined the information withheld from the documents at issue in this case were properly classified pursuant to the Executive Order.  Hilton Decl. ¶ 32.  Ms. Hilton has determined that the information withheld under Exemption (b)(1) in the disputed documents warrants classification at the TOP SECRET , SECRET and/or CONFIDENTIAL level in the interest of national defense or foreign policy, pursuant to E.O. 12958 § 1.4, because their release could be expected to:  (a) reveal information concerning intelligence activities and intelligence sources and methods, see Hilton Decl. ¶ 38; and (b) reveal sensitive foreign relations or foreign activities of the United States.  See id.  Moreover, as detailed below, the CIA has met its burden under Exemption 1 and established that all of the withheld information properly falls within one or more of these classification categories established by the Executive Order.

---

[4]     The parties agree that since plaintiff's FOIA request requested specific documents which were found, processed and produced to plaintiff, there is no issue as to the adequacy of defendants search.  See Hilton Decl. ¶ 12.

[5]     E.O. 12958 was amended by E.O. 13292, effective March 25, 2003.  See Exec. Order No. 12958, 3 C.F.R. (1995), reprinted as amended in 50 U.S.C. § 435 note at 91 (supp. 2004); see also Exec. Order No. 13292, 68 Fed. Reg. 15315 (March 28, 2003).  All citations herein to E.O. 12958 are to the Order as amended by E.O. 13292.

### 1.    The Standards for Exemption 1

Exemption 1 protects records that are:  (1) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy, and (2) are in fact properly classified pursuant to Executive Order.  See 5 U.S.C. § 552 (b)(1).  Section 1.2(a)(4) of E.O. 12958, as amended, states that an agency may classify information that fits into one or more of the Executive Order's categories for classification when the appropriate classification authority "determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security."  68 Fed. Reg. 15315, 15315 (March 25, 2003).  In other words, under Exemption 1, FOIA requesters are "not entitled to records that have been properly classified."  Blazy v. Tenet, 979 F. Supp. 10, 23 (D.D.C. 1997).

Executive Order 12,958, as amended, "Classified National Security Information,"  lists three classification levels for national security information:

(1)    Information that, if subject to unauthorized disclosure, reasonably could be expected to cause damage to national security may be classified as CONFIDENTIAL;

(2)    Information that, if subject to unauthorized disclosure, reasonably could be expected to cause serious damage to national security may be classified as SECRET; and

(3)    Information that, if subject to unauthorized disclosure, reasonably could be expected to cause exceptionally grave damage to national security may be classified as TOP SECRET.

E.O. 12,958, as amended, § 1.2.

An agency can demonstrate that it has properly withheld information under Exemption 1 if it establishes that it has met the requirements of the Executive Order.  Substantively, the

agency must show that the records at issue logically fall within the exemption, i.e., that E.O.

12958, as amended, authorizes the classification of the information at issue.  Procedurally, the

agency must demonstrate that it followed the proper procedures in classifying the information.

See Salisbury v. United States, 690 F.2d 966, 970-73 (D.C. Cir. 1982); Military Audit Project v.

Casey, 656 F.2d 724, 737-38 (D.C. Cir. 1981).  An agency meeting both tests is then entitled to

summary judgment.  See, e.g., Abbotts v. NRC, 766 F.2d 604, 606-08 (D.C. Cir. 1985); Miller v.

Casey, 730 F.2d 773, 776 (D.C. Cir. 1984).

Agency decisions to withhold classified information under FOIA are reviewed de novo by

the district court, and the agency bears the burden of proving its claim for exemption.  See 5

U.S.C. § 552(a)(4)(B); Miller, 730 F.2d at 776.  Nevertheless, because agencies have "unique

insights" into the adverse effects that might result from public disclosure of classified

information, the courts must accord "substantial weight" to an agency's affidavits justifying

classification.  Military Audit Project, 656 F.2d at 738; cf. Miller, 730 F.2d at 776 (court must

"accord substantial weight to an agency's affidavit concerning the details of the classified status

of the disputed record").   Indeed, "the court is not to conduct a detailed inquiry to decide

whether it agrees with the agency's opinions."  Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir.

1980); see Weissman v. CIA, 565 F.2d 692, 697 (D.C. Cir. 1997) ("Few judges have the skill or

experience to weigh the repercussions of disclosure of intelligence information").  To do so

would violate the principle of according substantial weight to the expert opinion of the agency.

Cf. Stillman v. CIA, 319 F.3d 546, 548 (D.C. Cir. 2003) (in non-FOIA case, criticizing district

court for withholding deference ordinarily owed to national security officials).

## 2.    The CIA Records Are Protected by Exemption 1.

The Hilton Declaration shows that the CIA has followed the proper procedures for invoking Exemption 1 in this case. Ms. Hilton, as an Associate Information Review Officer for the National Clandestine Service of the CIA, and under a written delegation of authority pursuant to E.O. 12,958, § 1.3(c), holds original classification authority at the TOP SECRET level. Hilton Decl. ¶ 5, 26. As a result, Ms. Hilton is authorized to "conduct classification reviews and to make classification and declassification decisions." Id. The Exemption 1 material withheld by the CIA in this matter is "properly classified as TOP SECRET, SECRET and/or CONFIDENTIAL." Id. ¶ 36.

Executive Order 12,958, as amended, provides that information shall not be classified unless it concerns one or more of eight categories. E.O. 12,958, § 1.4. In this case, the CIA's Exemption 1 withholdings implicate two categories for classified information:

- intelligence activities (including special activities), intelligence sources or methods, or cryptology, id. at § 1.4(c); and

- foreign relations or foreign activities of the United States, including confidential sources, id. at 1.4(d);

See Hilton Decl., ¶ 38. The classified information withheld by the CIA concerns foreign relations or foreign activities of the United States and contains details about intelligence methods and activities. Id. ¶ 38, 46-66. This information falls within the § 1.4 categories outlined above. Id.

As detailed below, the CIA has properly withheld classified information that would disclose intelligence sources, activities, operations and methods and/or foreign relations information because such disclosure would cause serious and specific harm to national security.

The CIA's assessment of harm to intelligence sources and methods, 'is entrusted to the Director of Central Intelligence, not to the courts.'" Students Against Genocide v. Dep't of State, 257 F.3d 828, 835 (D.C. Cir. 2001) (quoting Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990)). Accordingly, the CIA's determination of potential harms, discussed below, merits "substantial weight" from the Court, see ACLU v. DOJ, 265 F. Supp. 2d 20, 27 (D.D.C. 2003), because "'[e]xecutive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified record." Salisbury v. United States, 690 F.2d 966, 970 (D.C. Cir. 1982) (quoting S. Rep. No. 1200, 93rd Cong., 2d Sess. 12 (1974)); see also Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999) ("[m]indful that courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns"); Taylor v. Dep't of the Army, 684 F.2d 99, 109 (D.C. Cir. 1982) (agency's determination should be accorded "'utmost deference'") (quoting Halkin v. Helms, 598 F.2d 1, 9 (D.C. Cir. 1978)).   Thus, where an agency supplies a reasonably detailed affidavit, which identifies and describes the reasons for withholding Exemption 1 material, the Court "must take seriously the government's predictions about the security implications of releasing particular information to the public . . ." ACLU, 265 F. Supp. 2d at 28.[6]

   a.    **The CIA Properly Withheld Information That Would Disclose Intelligence Activities.**

Section 1.4(c) of Executive Order 12958, as amended, exempts intelligence activities

---

   [6]  To be sure, speculation as to the negative results likely to occur as a result of disclosure is necessarily suppositional.  However, courts have recognized that such speculation is inevitable, and that to require an actual showing of harm would be judicial "overstepping."  See Halperin v. CIA, 629 F.2d 144, 149 (D.C. Cir. 1980).

from disclosure. An "intelligence activity" refers to "the actual implementation of intelligence sources and methods in the operational context." Hilton Decl. ¶ 46. In the area of intelligence sources and methods, this Circuit has been strongly inclined to accept the agency's assessment that disclosure of such information will damage national security interests because the area is "necessarily a region for forecasts in which [the agency's] informed judgment as to potential future harm should be respected." Gardels v. CIA, 689 F.2d, 1100, 1106 (D.C. Cir. 1982). Indeed, the protection for information pertaining to sources and methods is so broad, that one federal appeals court has described it as a "near-blanket FOIA exemption," which is "only a short step [from] exempting all CIA records from FOIA." Minier v. CIA, 88 F.3d 796, 801 (9th Cir. 1996) (internal quotation marks and citation omitted).[7]

-----

[7]  The CIA must carefully review all potentially responsive records prior to any releases, to insure that important, confidential information is not released. See Hilton Decl. ¶ 3. This careful review is consistent with the recognition that the collection and preservation of information affecting the national security "is more akin to the construction of a mosaic than it is to the management of a cloak and dagger affair." Halkin v. Helms, 598 F.2d 1, 8 (D.C. Cir. 1978). One item's significance may frequently depend upon many other items of information. Indeed, this possibility is explicitly recognized in Executive Order 12958, which provides, "[c]ompilations of items of information which are individually unclassified may be classified if the compiled information reveals an additional association or relationship that meets the standards for classification under this order; and is not otherwise revealed in the individual items of information." E.O. 12958, § 1.7(e).

In fact, "the realities of intelligence work . . . often involves seemingly innocuous sources . . . ." CIA v. Sims, 471 U.S. 159, 176 (1985). Indeed, "[e]ach individual piece of intelligence information, much like a piece of a jigsaw puzzle, may aid in piecing together bits and pieces of other information even when the individual piece is not of obvious importance itself." Halperin v. CIA, 629 F.2d 144, 150 (D.C. Cir. 1980); see also Gould, Inc. v. GSA, 688 F. Supp. 689, 698 (D.D.C. 1988) ("Information drawn from a number of different sources can be benign when separately considered . . . [but] [w]hen combined . . . these various pieces of information can indeed become accusatory "); Salisbury v. United States, 690 F.2d 966, 971 (D.C. Cir. 1982) (acknowledging "mosaic-like nature of intelligence gathering"). Thus, "what may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item in its proper context." Sims, 471 U.S. at 178-79 (quoting Halkin, 598 F.2d at 9). Courts have upheld the withholding of information on grounds that it could be

Ms. Hilton identified information that reasonably could be expected to reveal intelligence activities such as sources and methods and confirmed it was properly classified. Hilton Decl ¶¶ 44, 45. Ms. Hilton explained that this information is highly sensitive because it often would reveal, "details regarding specific intelligence collection activities." Id. ¶ 46. Ms. Hilton goes on to explain that disclosure of the "existence (or non-existence) of a particular intelligence collection activity would reveal U.S. intelligence needs, priorities, and capabilities to foreign intelligence services or hostile organizations seeking to take advantage of any national security weakness." Id. ¶ 47.

Generally, the damage caused by disclosure of intelligence activities information is obvious. Foreign government services and hostile organizations would be put on notice that their activities and information are being monitored and analyzed by the CIA. Id. This would make future intelligence collection activities more difficult and, as a consequence, make the conduct of such operations significantly more dangerous. Id. Courts afford substantial deference to the government's assessment that disclosure of source information will damage national security interests because the area is "necessarily a region for forecasts in which [the government's] informed judgment as to potential future harm should be respected." Gardels v. CIA, 689 F.2d, 1100, 1106 (D.C. Cir. 1982); see also Schrecker v. DOJ, 254 F.3d 162, 166 (D.C. Cir. 2001) (protecting intelligence sources because release would harm national security by "dissuading current and future sources from cooperating").

---

compiled in a way such that sensitive information would be released. See, e.g., Taylor v. Dep't of the Army, 684 F.2d 99, 104-05 (D.C. Cir. 1982); National Sec. Archive v. FBI, 759 F. Supp. 872, 877 (D.D.C. 1991); American Friends Serv. Comm. v. DOD, 831 F. 2d 441, 444-45 (3d Cir. 1987).

Specifically, the CIA invoked Exemption 1 to withhold information from the CSRT

transcripts and documents provided to the CSRT regarding intelligence activities and/or methods

involving:  (1) detention and conditions of confinement; and (2) information concerning

interrogation methods.  The information provided in the Hilton Declaration demonstrates that the

redacted  information "pertains directly to intelligence sources and methods and that disclosure

of this information could be detrimental to an individual or to the CIA itself."  Snyder v. CIA,

230 F. Supp. 2d. 17, 23 (D.D.C. 2002).  The descriptions are in line with the kind of detail

required by the courts in an Exemption 1 claim.  See, e.g., Goland v. CIA, 607 F.2d 339, 351

(D.C. Cir. 1979) (approving of CIA declaration which highlighted classified nature of

information withheld and harms that would result from disclosure).

### (i)      Detention and Conditions of Confinement

The redacted information  at issue in this case relate to a "highly classified CIA program

to capture, detain, and interrogate key terrorist leaders and operatives in order to prevent terrorist

attacks (the "Program")."  Hinton Decl. ¶ 49.  As part of the Program, the President has

authorized the CIA to establish terrorist detention facilities outside the United States, however

the details of the program remain classified.  Id.  The President has also made clear that the CIA

detention program will continue into the future.  Id. ¶ 54.  As described in the Hilton declaration,

in addition to the levels of classification outlined in Executive Order 12958 § 1.2., section 4.3

provides that:

> specified officials may create special access programs upon a finding that the
> vulnerability of, or threat to, specific information is exceptional, and the normal
> criteria for determining eligibility for access applicable to information classified at
> the same level are not deemed sufficient to protect the information from
> unauthorized disclosure. The CIA is authorized to establish special access

> programs relating to intelligence activities, sources, and methods. These special
> access programs relating to intelligence are called Sensitive Compartmented
> Information (SCI) programs.

Hilton Decl. ¶ 52.  Due to the importance of the information and the grave damage to national

security if released, information regarding detention and conditions of confinement, including

where the detainees had been held, the details of their confinement, the employment of

alternative interrogation methods, and other operational details, has been placed in a TOP

SECRET//SCI program to enhance protection from unauthorized disclosure.  Id. ¶¶ 51, 53.

In her declaration, Ms. Hilton describes the specific harms that would result from the

release of this information.  First, disclosure of the intelligence sources and methods relating to

the Program contained in the documents requested by plaintiff, "is reasonably likely to degrade

the CIA's ability to effectively question terrorist detainees and elicit information necessary to

protect the American people."  Id. ¶ 53.  Second, the continued success of the Program relies on

the cooperation of foreign governments and use of effective interrogation techniques.

Unauthorized disclosure of these details of the Program "would undermine both of these

requirements."  Id. ¶ 54.  Finally, unauthorized disclosure of details regarding the conditions of

detention and specific alternative interrogation procedures reasonable could be expected to result

in exceptionally grave damage to the national security.  Id.  For example, the CIA redacted

several pages from the CSRT transcript of Abu Zubaydah because it contained detailed

information regarding his detention and conditions of confinement as well as intelligence

information he provided during his detention and interrogation.  Id. at 24.

Because their disclosure could reasonably be expected to cause these specific and

exceptionally grave harms to national security, information related to detention and conditions of

-13-

confinement are properly classified at the "TOP SECRET//SCI" level and withheld pursuant to

E.O. 12958, as amended, § 1.4 (c) and exempt from disclosure pursuant to Exemption 1.

**(ii)    Interrogation Methods**

Another form of intelligence activity information redacted from the documents produced

to plaintiff involves interrogation methods used by the CIA to acquire information regarding

terrorist threats.  Hilton Decl. ¶ 55-58.  These interrogation methods have provided information

regarding possible terrorist targets and methods of attacks on the United States, including

information sufficient to "thwart a plot to fly a plane into the tallest building in Los Angeles."  Id.

¶ 56.  In addition, use of interrogation methods as part of the CIA detention program has

disrupted plots that involved flying hijacked planes into Heathrow Airport and the Canary Wharf

in London and attacking the U.S. consulate in Karachi, Pakistan, using car bombs and motorcycle

bombs.  Id.  Further, information acquired in the Program through the use of interrogation

methods has been essential in the capturing and questioning of senior al Qaeda operatives.  Id.

"For example, interrogations of detainees produced information that provided initial leads to the

locations of al Qaeda operatives, which led to their capture.  In addition, the United States gained

valuable information that explained previously unknown details of al Qaeda, such as its

organization, financing, communications, and logistics."  Id.

Because acquiring this type of information from terrorists is so valuable, al Qaeda and

other terrorist organizations specifically train their members in counter-interrogation techniques.

National security is threatened by release of questioning procedures and methods used by the

CIA as part of the detention program because it would allow:

al Qaeda and other terrorists to more effectively train to resist such techniques, which

-14-

would result in degradation in the effectiveness of the techniques in the future.  If detainees in the CIA program are more fully prepared to resist interrogation, it could prevent the CIA from obtaining vital intelligence that could disrupt future attacks.

Hilton Decl. ¶ 55.

This information has been classified at the TOP SECRET//SCI level because interrogation methods are integral to the CIA's detention program.  Hilton Decl. ¶ 55.  "If the CIA were to reveal intelligence information gained through its use of interrogation methods, the information would no longer be useful in counterterrorism efforts."  Id. at 58.  In addition, the types of questions asked and specific questions to particular detainees must be protected because they could provide insight to the intelligence interests and knowledge of the CIA.  Id. at 57.  Public disclosure could reveal, "what the CIA knew at the time and allow others to infer what the CIA did not know at the time."  Id.  This would allow other terrorists "to make judgments about the intelligence capabilities of the CIA and to anticipate the type of questioning they might undergo."  Id.  For example, CIA redacted information from the CSRT transcript of Khalid Sheikh Muhammad that revealed the interrogation methods he claims to have experienced, as well as the specific questions posed to him during interrogation which would reveal the intelligence interests of the CIA.  Id ¶ 27.

As the disclosure of this information could reasonably be expected to cause these specific and exceptionally grave harms to national security, along with the additional harms to associated with disclosure of intelligence activities, information related to alternative questioning techniques is properly classified at the "TOP SECRET//SCI" level and withheld pursuant to E.O. 12958, as amended, § 1.4 (c) and exempt from disclosure pursuant to Exemption 1.  See McErlean v. United States Dep't of Justice, Civ No. 97-7831-BSJ, 1999 WL 791680, at **5-6

(S.D.N.Y. Sept. 30, 1999) (holding that the government correctly withheld classified information that "identifies an CIA investigative unit which is assigned to, and specializes in, specific intelligence or counterintelligence operations" because disclosure "would reveal an intelligence operation which is still ongoing today").

For all of the foregoing reasons, the CIA properly withheld classified information that would reveal or identify the CIA's intelligence activities, operations, or methods.

### b. The CIA Properly Withheld Foreign Relations and Foreign Activities of the United States Information

The CIA has also properly classified and withheld information concerning the foreign relations and/or foreign activities of the United States. Section 1.4(d) of Executive Order 12958, as amended, exempts from disclosure foreign relations and activities information, including that concerning cooperative endeavors between the CIA and foreign governments' intelligence components. "In this case, foreign governments have provided critical assistance to CIA counterterrorism operations, including but not limited to hosting of foreign detention facilities, under the condition that their assistance be kept secret." Hilton Decl. ¶ 60. The withheld information identifies the specific locations of the CIA's detention program's foreign locations as well as other "critical assistance that foreign countries have provided the to to the CIA's counterterrorism operations . . ." Id.; see Snyder v. CIA, 230 F. Supp. 2d 17, 23 (D.D.C. 2002) (finding Exemption 1 satisfied by government explanation that "disclosure of the withheld information could reveal the names and location of covert foreign CIA installations . . ."). It is enough to uphold the CIA's assertion of Exemption 1 over information concerning these confidential relationships with other nations once it is established the confidential cooperation is

-16-

understood among the nations and ongoing.  See, e.g., Linn v. DOJ, Civ. No. 92-1406, 1995 WL

631847, at *26 (D.D.C. August 22, 1995) (Exemption 1 withholding of information concerning

cooperative relationship with foreign component was proper where FBI demonstrated "that the

United States has a present understanding with the foreign government at issue that shared

information will remain secret and that information concerning the relationship between the

United States and that government will also remain secret"); see also Navasky, 521 F. Supp at

129-30 .

      Ms. Hilton goes on to detail the specific harms that could reasonably be expected to result

from disclosure of this classified information.  Unauthorized disclosure of this information,

"would damage the CIA's relations with these foreign governments and could cause them to

cease cooperating with the CIA on such matters . . . If the United States demonstrates that it is

unwilling or unable to stand by its commitments to foreign governments, they will be less willing

to cooperate with the United States on counterterrorism activities."  Hilton Decl. ¶ 60  Thus,

disclosure of the classified information regarding the Program contained in the documents

provided to plaintiff are reasonably likely to damage foreign relations.  Id. ¶ 49; see also Malizia

v. U.S. Dep't of Justice, 519 F. Supp. 338, 343 (S.D.N.Y. 1981) ("Unauthorized disclosure of

foreign government information is presumed to cause at least identifiable damage to the national

security.").

      In her declaration, Ms. Hilton is able to provide a real world example of the damage to

national security that can result from disclosure of foreign relations information regarding the

CIA detention program:

Just prior to the President's 6 September 2006 speech announcing the transfer of detainees to Guantanamo Bay, the CIA provided certain foreign governments specific assurances that the CIA would protect the fact of their cooperation from disclosure. These liaison partners expressed their deep appreciation and highlighted that their continued cooperation was conditioned on the CIA's commitment and ability to keep their assistance strictly confidential.  In one instance, however, a particular foreign government reduced its cooperation with the CIA when its role in the terrorist detention program leaked to a third country whose national had been detained within the program. The foreign government lost the trust and cooperation of that third country in matters of their own national security.  Repair of the CIA's relationship with this foreign government came only through the senior-level intervention of the CIA Director personally apologizing for the leak.  Despite this significant effort, to this day the damage this one incident has caused to the CIA's relationship with the foreign government is incalculable, as the CIA can never be sure to what extent the foreign government is withholding vital intelligence necessary to the national security of the United States.

Hilton Decl. ¶ 61-62.  Therefore, the CIA has properly invoked Exemption 1 to withhold properly classified information regarding foreign relations.  See Halpern v. FBI, No. 94-CV-365A, 2002 WL 31012157, *7 (August 31, 2001) (holding that the FBI properly withheld information under Exemption 1 because disclosure would "identif[y] a foreign government component that expects its cooperative endeavors with the FBI to remain classified"); Malizia, 519 F. Supp. at 344 ("It is clear that, even without the presumption of identifiable damage to the national security that is accorded foreign government information, disclosure of such cooperation with foreign agencies could not only damage the (FBI's) ability to gather information but could also impair diplomatic relations.") (internal citations omitted); Navasky v. CIA, 521 F. Supp 128, 129-30 (S.D.N.Y. 1981) (holding that CIA declaration "justif[ied] a finding that the disclosure of the classified information at issue could reasonably be expected to cause identifiable damage to the national security in the field of foreign relations" where CIA invoked Exemption 1 to withhold information relating to CIA's clandestine activities in book publication and distribution done in support of foreign policy objectives and aimed at foreign targets).

The government is entitled to summary judgment on when agency affidavits contain "reasonable specificity" and are not called into question by contradictory evidence in the record or by evidence of agency bad faith.  See Krikorian v. United States Dep't of State, 984 F.2d 461, 464-65 (D.C. Cir. 1993).  The Hilton Declaration is reasonably specific; it provides the information required by E.O. 12958, and the records are properly classified as SECRET and/or TOP SECRET as they could reasonably be expected to cause serious or exceptionally grave damage to the national security of the United States.  Hilton Decl. ¶ 63.  The declaration also describes the withheld documents in as much detail as is possible "without 'compromis(ing) the secret nature of the information.'"  Goland, 607 F.2d at 351-52 (quoting Vaughn v. Rosen, 484 F.2d 820, 826-27 (D.C. Cir. 1973)).  Accordingly, these records are protected from disclosure by Exemption 1.

**B.   CIA Has Properly Invoked Exemption 3.**

The CIA has withheld records and information protected by FOIA Exemption 3.   DoD has also withheld a small amount of information pursuant to FOIA Exemption 3.   In examining an Exemption 3 claim, a court must determine, first, whether the claimed statute is a statute of exemption under FOIA, and, second, whether the withheld material satisfies the criteria of the exemption statute.  See CIA v. Sims, 471 U.S. 159, 167 (1985); Fitzgibbon v. CIA, 911 F.2d 755, 761 (D.C. Cir. 1990).

The CIA's Exemption 3 withholdings are based on two statutes:

(1)   Section 102A(i)(1) of the National Security Act of 1947, see 50 U.S.C. § 403-1(i)(1), which requires the CIA to protect intelligence sources and methods from unauthorized disclosure; and

(2)   Section 6 of the Central Intelligence Agency Act of 1949, see 50

-19-

U.S.C. § 403g, which provides that the CIA shall be exempt from
the provision of any other law requiring the publication or
disclosure of the organization, function, names, official titles,
salaries, or numbers of personnel employed by the CIA.

See Hilton Decl., ¶ 67-69.

Because the threshold issue for the application of Exemption 3 is based on the statute

invoked by the agency, the analysis is somewhat different.  As the D.C. Circuit has explained,

"[e]xemption 3 differs from other FOIA exemptions in that its applicability depends less on the

detailed factual contents of specific documents; the sole issue for decision is the existence of a

relevant statute and the inclusion of withheld material within that statute's coverage."  Goland,

607 F.2d at 350-51.

### 1.    The CIA's Withholdings Under the National Security Act of 1947 Are Protected by Exemption 3.

The National Security Act of 1947 requires the Director of the CIA to safeguard

information concerning CIA intelligence sources and methods.[8]  See 50 U.S.C. § 403-1(i)(1).

The statute falls within the ambit of Exemption 3.  See, e.g., Sims, 471 U.S. at 167 ("Congress

vested in the Director of Central Intelligence very broad authority to protect all sources of

intelligence information from disclosure."); Krikorian, 984 F.2d at 465 ("It is well settled that

section [403-3(c)(7)] falls within exemption 3."); Goland, 607 F.2d at 350-51; Snyder, 230 F.

Supp. 2d at 22-23; Blazy, 979 F. Supp. at 23.

The CIA Director's obligation to protect information pertaining to agency sources and

methods reflects Congress's intent to "give the [agency] broad authority to protect the secrecy

---

[8]  This information has also been withheld pursuant to Exemption 1 and is described in
more detail in that part of this memorandum and in the Hilton Declaration.  See, supra, at II.A;
Hilton Decl., ¶¶ 46-66, 70.

and integrity of the intelligence process." <u>Sims</u>, 471 U.S. at 170.

> Plainly the broad sweep of this statutory language comports with the nature of the Agency's unique responsibilities.  To keep informed of other nations' activities bearing on our national security the Agency must rely on a host of sources.  At the same time, the Director must have the authority to shield those Agency activities and sources from any disclosures that would unnecessarily compromise the Agency's efforts.

<u>Id.</u> at 169.  In a similar vein, the Ninth Circuit has noted that the "sources and methods" statutory mandate is a "near-blanket FOIA exemption," which is "only a short step [from] exempting all CIA records from FOIA." <u>Minier</u>, 88 F.3d at 801.  Accordingly, the CIA need only demonstrate that the information "relates to intelligence sources and methods." <u>Fitzgibbon</u>, 911 F.2d at 762. Like the agency's determination under Exemption 1, the agency's determination under exemption 3 is entitled to "substantial weight and due consideration." <u>Id.</u>; <u>Linder v. DOD</u>, 133 F.3d 17, 25 (D.C. Cir. 1998).

> **2.      The CIA's Withholdings Under the Central Intelligence Agency Act of 1949 Are Protected by Exemption 3.**

Section 6 of the Central Intelligence Agency Act of 1949 mandates that the CIA "shall be exempted from . . . the provisions of any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency . . . ." 50 U.S.C. § 403g.  This statute also meets the requirements of Exemption 3. <u>See</u>, <u>e.g.</u>, <u>Goland</u>, 607 F.2d at 350-51; <u>Sims</u>, 471 U.S. at 167; <u>Snyder</u>, 230 F. Supp. 2d at 22-23; <u>Blazy</u>, 979 F. Supp. at 23.

Because all the information withheld by the CIA in the six transcripts and three documents provided by the detainees to the CSRT would disclose functions of the CIA, that information is also properly withheld under this statute.  Hilton Decl. ¶¶21-30, 69.  As described

above, each of the classified categories of information contained in the documents at issue in this

case relates to the CIA's ability to collect counterterrorism intelligence and perform

counterintelligence functions which are core functions of the CIA.  Id. ¶ 69.  For example, the

information redacted from the CSRT transcript of Majid Kahn provides detailed information

regarding his capture as well as, "the conditions and locations of his detention, interrogation

methods he claims to have experienced, intelligence information gained through his detention

and interrogation, and information relating to foreign relations and foreign activities of the

United States."  Hilton Decl. ¶ 26.  To reveal this information would force the CIA to disclose

critical functions of the CIA and its personnel.  Id.  Similarly, the CIA redacted information in a

written statement prepared by Hambali and submitted by him as an exhibit to his CSRT that

contained information detailing the conditions of his interrogation, including specific questions

he was asked, information regarding his capture and detention, interrogation methods he claims

to have experienced, and information relating to foreign relations and foreign activities of the

United States.  Id. at ¶ 29.  Again, this is information central to the mission of the CIA and would

disclose critical functions of the CIA and its personnel.  Id.

 The CIA withheld information pursuant to statutes that shield information from

disclosure under the FOIA.  Accordingly, the information is protected by Exemption 3, and

summary judgment should be granted for the CIA.[9]

---

[9] Pursuant to Exemption 3 and Exemption 6, DoD redacted a small amount of information that would reveal the names of DoD personnel who are deployed to the Office for the Administrative Review of the Detention of Enemy Combatants Forward in Guantanamo Bay, Cuba.  Plaintiff does not challenge these redactions by DoD.

**C. The CIA Has Reasonably Segregated Exempt Portions of the Documents.**

The FOIA requires agencies to release "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  Consistent with this obligation, the CIA has provided plaintiff with as much non-exempt information as possible without compromising the interests in nondisclosure protected by the FOIA.  Hilton Decl. ¶ 3,71.  The CIA released all documents responsive to plaintiff's FOIA request either in whole or in part.  Hilton Decl. ¶ 71.  With respect to the documents released in part, Ms. Hilton conducted a line-by-line review of those documents to identify and release all reasonably segregable, non-exempt portions of the documents.  Id.  Based on that review, the CIA released all the information that could be reasonably segregated from the information withheld pursuant to Exemptions 1 and 3.  Id.

//

//

//

-23-

**CONCLUSION**

For the foregoing reasons, the Court should enter summary judgment for defendants.

Dated: June 30, 2008

Respectfully Submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
(D.C. Bar #418925)
Assistant Director

   /s/ James J. Schwartz
JAMES J. SCHWARTZ (D.C. Bar No. 468625)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7140
Washington, D.C.  20530
Tel.: (202) 616-8267
Fax: (202) 616-8202
Email: james.schwartz@usdoj.gov
Counsel for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
AMERICAN CIVIL LIBERTIES UNION,         )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        Civil Action No. 08-00437 (RCL)
                                        )
DEPARTMENT OF DEFENSE,                  )
                                        )
CENTRAL INTELLIGENCE AGENCY             )
            Defendants.                 )
_____  )

**DEFENDANTS' STATEMENT OF FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure
56.l, defendants respectfully submit the following material facts as to which there is no genuine
issue to be tried:

1.    By letter dated April 20, 2007, Plaintiffs submitted a FOIA request to DOD and
      CIA requesting documents relating to 14 High-Value Detainees ("HVDs")
      currently in detention in Guantánamo Bay, Cuba.  See Exhibit A to the Hilton.

2.    The fourteen HVDs that are the subject of Plaintiffs' FOIA request are Abu Faraj
      al-Libi, Walid Bin Attash, Khalid Sheikh Muhammad, Ramzi Bin al-Shib, Ahmed
      Khalfan Ghailani, Mohd Farik bin Amin (known as Zubair), Mustafa Al
      Hawsawi, Abd Al Rahim Hussein Mohammed (known as Al Nashiri), Bashir Bin
      Lap (known as Lillie), Ammar Al Baluchi, Rjduan Bin Isomuddin (known as
      Hambali), Zayn Al Abidin Muhammad Husayn (known as Abu Zubaydah), Majid
      Khan, and Guleed Hassan Ahmed.  Hilton Decl. n. 2.

3.    Each of these 14 HVDs had a hearing in Spring 2007 before the Combatant Status

Review Tribunal ("CSRT") in Guantánamo Bay.  Hilton Decl. ¶ 9.

4.    On May 4, 2007, the CIA acknowledged receipt of Plaintiffs' FOIA request and

granted Plaintiffs' request for expedited processing and fee waiver.  See Exhibit B

to the Hilton Decl.

5.    Prior to processing Plaintiffs' FOIA request, the CIA had reviewed and redacted

six of the 14 transcripts in order for DOD to make them publicly available.  The

CIA determined, at that time, that the remaining eight transcripts did not require

redaction.  The six redacted and eight unredacted transcripts have been publicly

available through DOD's website since August 9, 2007.  Hilton Decl. ¶ 14.

6.    In response to Plaintiffs' FOIA request, the CIA re-reviewed the transcripts

according to FOIA standards.  Based on that review the CIA determined that the

information redacted from the six transcripts could not be publicly released.

Hilton Decl. ¶ 14.

7.    Most of the six redacted transcripts are not heavily redacted. Only one transcript

has several pages redacted out of a total of 50 pages for that transcript.  Hilton

Decl ¶ 26.  One transcript has only one sentence redacted while another has only a

portion of one paragraph.  Id. ¶¶ 22, 25.  The remaining three transcripts only

contain redactions on several of their pages.  Id. ¶¶ 23, 24, 27.

8.    Once the CIA completed the review of the transcripts in response to Plaintiffs'

FOIA request, the CIA transmitted the transcripts to DOD for their release to

Plaintiffs.   DOD released the Transcripts to Plaintiffs on June 13, 2008.  Hilton

2

Decl. ¶ 16.

9.      In addition to the CSRT transcripts, the CIA identified documents submitted by

the HVDs or their Personal Representatives to the CSRT, which are responsive to

the second item in Plaintiffs' FOIA request.  Many of these documents, such as

prepared statements by the HVDs, were read verbatim into the transcript of the

CSRT.  Only five of these documents that are not publicly available were not

included in the CSRT transcripts.  Hilton Decl. ¶ 17.

10.     The CIA processed these five documents, totaling 13 pages, in response to

Plaintiffs' FOIA request: (1) a one-page diary excerpt of Abu Zubaydah; (2) a

two-page written statement of Khalid Sheikh Muhammad; (3) a seven-page

written statement of Hambali; (4) two pages of "Detainee Session Notes" prepared

by the Personal Representative of Majid Khan and entered into evidence at his

CSRT hearing; and (5) A one-page written statement of Bin Lap  responding to

particular items of evidence.  Hilton Decl. ¶¶ 18, 19.

11.      The CIA determined that two of the documents could be released in full and that

certain information redacted from the three other documents could not be publicly

released.  Hilton Decl. ¶ 19.

12.     Once the CIA completed the review of these five documents, the CIA transmitted

them to DOD for their release to Plaintiffs.  DOD released all segregable

information from these five documents to Plaintiffs on June 25, 2008.  Hilton

Decl. ¶ 20.

Dated: June 30, 2008

Respectfully Submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
(D.C. Bar #418925)
Assistant Director

   /s/ James J. Schwartz
JAMES J. SCHWARTZ (D.C. Bar No. 468625)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7140
Washington, D.C.  20530
Tel.: (202) 616-8267
Fax: (202) 616-8202
Email: james.schwartz@usdoj.gov
Counsel for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
AMERICAN CIVIL LIBERTIES UNION,   )
                                                      )
            Plaintiff,                             )
                                                      )
            v.                                      )          Civil Action No. 08-00437 (RCL)
                                                      )
DEPARTMENT OF DEFENSE,           )
                                                      )
CENTRAL INTELLIGENCE AGENCY   )
            Defendants.                         )
_____)

**[PROPOSED] ORDER**

THIS MATTER having come before the Court on the Motion for Summary

Judgment by Defendants, and good cause having been shown, it is hereby

ORDERED that the Motion is GRANTED; and it is further

ORDERED that summary judgment is awarded to the Defendants United States

Department of Defense and Central Intelligence Agency with respect to all claims raised

against it by the Plaintiff, American Civil Liberties Union; and it is further

ORDERED that the Clerk of the Court shall enter judgment in favor of the

Defendants United States Department of Defense and Central Intelligence Agency.

**IT IS SO ORDERED.**

Dated: _____

                                                      _____
                                                      THE HON. ROYCE C. LAMBERTH
                                                      United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION,　)
et al.,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　Plaintiffs,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　) Case 1:08-cv-00437
　　　　　　　　　　　　　　　　　)
DEPARTMENT OF DEFENSE, et al.,　 )
　　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　　 )
_____ )


DECLARATION OF WENDY M. HILTON
ASSOCIATE INFORMATION REVIEW OFFICER
NATIONAL CLANDESTINE SERVICE
<u>CENTRAL INTELLIGENCE AGENCY</u>


　　　I, WENDY M. HILTON, hereby declare and say:

　　　1.  I am an Associate Information Review Officer (AIRO) for
the National Clandestine Service (NCS) of the Central
Intelligence Agency (CIA).  I was appointed to this position in
March 2007.  I have held a variety of positions in the CIA since
I became a staff officer in 1983.

　　　2.  The NCS is the organization within the CIA responsible
for conducting the CIA's foreign intelligence and
counterintelligence activities; conducting special activities,
including covert action; conducting liaison with foreign
intelligence and security services; serving as the repository
for foreign counterintelligence information; supporting

clandestine technical collection; and coordinating CIA support
to the Department of Defense.  Specifically, the NCS is
responsible for the conduct of foreign intelligence collection
activities through the clandestine use of human sources.

3.  As the AIRO, I am authorized to assess the current,
proper classification of CIA information based on the
classification criteria of Executive Order 12958, as amended,[1]
and applicable CIA regulations.  As part of my official duties,
I ensure that determinations such as the release or withholding
of information related to the CIA are proper and do not
jeopardize CIA interests, personnel, or facilities, and, on
behalf of the Director of the CIA, do not jeopardize CIA
intelligence activities, sources, or methods.  I am able to
describe, based on my experience, the damage to the national
security that reasonably could be expected to result from the
unauthorized disclosure of classified information.

4.  The CIA's Director of Information Management Services,
under authority delegated to him by the Associate Deputy
Director of the CIA, has appointed me Records Validation Officer
(RVO) for the purpose of this litigation.  As RVO, I am
authorized to have access to all CIA records on any subject

---

[1] Executive Order 12958 was amended by Executive Order 13292.  See Exec. Order
No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).  All citations to Exec. Order
No. 12958 are to the Order as amended by Exec. Order No. 13292.  See Exec.
Order No. 12958, 3 C.F.R. § 333 (1995), reprinted as amended in 50 U.S.C.A.
§ 435 note at 193 (West Supp. 2008).

relevant to this litigation, and am authorized to sign
declarations on behalf of the CIA regarding searches of CIA
records systems and the contents of records, including those
located in, or containing information under the cognizance of,
the NCS and CIA directorates other than the NCS.  For any
records containing information that does not originate in, or
come under the cognizance of, the NCS, I make the following
statements based on representations made to me in my capacity as
Records Validation Officer for the purpose of this litigation.

   5.  As a senior CIA official and under a written delegation
of authority pursuant to section 1.3(c) of Executive Order
12958, as amended ("Executive Order 12958"), I hold original
classification authority at the TOP SECRET level.  I am
authorized, therefore, to conduct classification reviews and to
make original classification and declassification decisions.

   6.  Through the exercise of my official duties, I am
familiar with this civil action.  I make the following
statements based upon my personal knowledge and information made
available to me in my official capacity.

   7.  The purpose of this declaration is to describe, to the
greatest extent possible on the public record, the CIA's search
for documents responsive to Plaintiffs' FOIA request, the
documents located, and the FOIA exemptions upon which the CIA

relied to redact and withhold documents and information responsive to Plaintiffs' FOIA request.

8.  For the Court's convenience, I have divided this declaration into four parts:  (1) Plaintiffs' FOIA request and subsequent proceedings; (2) CIA's records systems and search for documents responsive to Plaintiffs' FOIA request; (3) a description of the information redacted from the documents responsive to Plaintiffs' FOIA request; and (4) applicable FOIA exemptions.  The third part of this declaration describes, to the extent possible in an unclassified manner, the information the CIA withheld from the responsive documents.  If the Court determines that it needs additional information about the withheld information in this litigation, I can provide a more detailed declaration.  However, that declaration would contain classified information and would have to be filed ex parte and under seal for the Court's in camera review.

## I.  Plaintiffs' FOIA Request and Subsequent Proceedings

9.  By letter dated 20 April 2007, Plaintiffs submitted a FOIA request to the Department of Defense (DOD) and the CIA requesting documents relating to fourteen High-Value Detainees ("HVDs") detained at the United States Naval Base Guantánamo

Bay, Cuba.[2]  Each of these fourteen HVDs had a hearing in Spring

2007 before a Combatant Status Review Tribunal ("CSRT") in

Guantánamo Bay.  Specifically, with respect to each of the

fourteen HVDs, Plaintiffs requested:

> a.  Unredacted versions of the CSRT hearing
> transcripts;
>
> b.  Copies of all records provided to the CSRT by the
> detainees or their Personal Representative; and
>
> c.  Copies of all records provided to the CSRT by the
> Recorder.

10.  In addition, Plaintiffs' FOIA request included a

request for expedited processing and a fee waiver.  A true and

correct copy of the FOIA request is attached as Exhibit A.

11.  By letter dated 4 May 2007, the CIA acknowledged

receipt of Plaintiffs' FOIA request and granted Plaintiffs'

request for expedited processing and a fee waiver.  A true and

correct copy of the CIA's 4 May 2007 letter is attached as

Exhibit B.

12.  I understand that in May 2008 the Government and

Plaintiffs agreed that this litigation would encompass only the

first two items in Plaintiffs' FOIA request, and not the third

item that requested records provided by the CSRT to the

---

[2] The fourteen HVDs that are the subject of Plaintiffs' FOIA request are Abu
Faraj al-Libi, Walid Bin Attash, Khalid Sheikh Muhammad, Ramzi Bin al-Shibh,
Ahmed Khalfan Ghailani, Mohd Farik bin Amin (known as Zubair), Mustafa Al
Hawsawi, Abd Al Rahim Hussein Mohammed (known as Al Nashiri), Bashir Bin Lap
(known as Lillie), Ammar Al Baluchi, Riduan Bin Isomuddin (known as Hambali),
Zayn Al Abidin Muhammad Husayn (known as Abu Zubaydah), Majid Khan, and
Guleed Hassan Ahmed.

Recorder.  I understand that the Government is filing a motion for summary judgment.  This declaration is filed in support of the Government's motion for summary judgment.

## II.  The CIA's Search for and Processing of Records Responsive to Plaintiffs' FOIA Request

13.  The CIA identified fourteen transcripts of CSRT hearings as responsive to Plaintiffs' FOIA request.

14.  Separately from Plaintiffs' FOIA request and at DOD's request, the CIA had conducted classification reviews of the CSRT hearing transcripts for the fourteen HVDs.  During this review the CIA determined that eight of the transcripts were unclassified and six of the transcripts were classified.  The CIA redacted classified information from the six classified transcripts to produce redacted, unclassified versions of the transcripts.  I understand that DOD posted all fourteen transcripts--eight unclassified and six redacted--on DOD's website, where they have been available to the public since 9 August 2007.

15.  In response to Plaintiffs' FOIA request, the CIA reviewed the transcripts according to FOIA standards.  Based on that review, the CIA determined that the information the CIA originally redacted from the six transcripts could not be publicly released and is appropriately exempt from disclosure

under FOIA exemptions (b)(1) and (b)(3), as discussed in detail below.

16.   After the CIA completed its review of the transcripts in response to Plaintiffs' FOIA request, the CIA transmitted the redacted transcripts to DOD for their release to Plaintiffs.  I understand that DOD released the transcripts to Plaintiffs on 13 June 2008.

17.   In addition to the CSRT transcripts, the CIA also identified documents submitted by the HVDs or their Personal Representatives to the CSRT, which are responsive to the second item in Plaintiffs' FOIA request.  Many of these documents, such as prepared statements by the HVDs, were read verbatim into the record of the CSRT and are contained in the transcript.  Based on my review of the CSRT transcripts and the documents submitted to the CSRT by the HVDs or their Personal Representative, I have determined that only five of these documents that are not publicly available were not included in the CSRT transcripts.

18.   These five documents are:

   a.   A one-page diary excerpt of Abu Zubaydah;

   b.   A two-page written statement of Khalid Sheikh Muhammad;

   c.   A seven-page written statement of Hambali;

   d.   Two pages of "Detainee Session Notes" prepared by the Personal Representative of Majid Khan and entered into evidence at his CSRT hearing; and

      e.   A one-page written statement of Bin Lap
responding to particular items of evidence.

19.  The CIA processed these five documents in response to
Plaintiffs' FOIA request and determined that two of the
documents--items a. and d. above--could be released in full.
The remaining three documents contain information that is exempt
from disclosure pursuant to FOIA exemptions (b)(1) and (b)(3).
This information was redacted from the following three
documents:  the written statement of Khalid Sheikh Muhammad; the
written statement of Hambali; and the written statement of Bin
Lap.

20.  After the CIA completed the review of these five
documents, the CIA released them directly to Plaintiffs on 25
June 2008.

## III.  Document Redactions

21.  As noted above, the CIA redacted information from six
of the fourteen CSRT transcripts and three of the five documents
responsive to Item 2 of Plaintiffs' FOIA request.  I will now
summarize the information redacted from each of these documents,
to the extent possible on the public record.

22.  From the CSRT transcript of Mustafa Al Hawsawi, the
CIA redacted only one sentence on page 24 of the transcript.
This sentence contains information regarding foreign relations
and foreign activities of the United States, which is properly

classified as explained in Section IV.A.2. below.  In addition,
the redacted information relates to a core function of the CIA
and its personnel--collection, analysis, and dissemination of
foreign intelligence derived from clandestine intelligence
activities, sources, and methods--that is protected from
disclosure by the National Security Act of 1947 and the Central
Intelligence Agency Act of 1949.

23.  From the CSRT transcript of Al Nashiri, the CIA made
redactions on several pages.  The CIA redacted detailed
information from these pages regarding the detention of Al
Nashiri and the conditions of his confinement, as well as the
interrogation methods that he claims to have experienced and
intelligence information that Al Nashiri provided during his
detention and interrogation.  This information is properly
classified as explained in Section IV.A.2. below.  In addition,
the redacted information relates to a core function of the CIA
and its personnel--collection, analysis, and dissemination of
foreign intelligence derived from clandestine intelligence
activities, sources, and methods--that is protected from
disclosure by the National Security Act of 1947 and the Central
Intelligence Agency Act of 1949.

24.  From the CSRT transcript of Abu Zubaydah, the CIA made
redactions on several pages.  The CIA redacted detailed
information from these pages regarding the detention of Abu

Zubaydah and the conditions of his confinement, as well as the interrogation methods that he claims to have experienced and intelligence information that Abu Zubaydah provided during his detention and interrogation.  This information is properly classified as explained in Section IV.A.2. below.  In addition, the redacted information relates to a core function of the CIA and its personnel--collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that is protected from disclosure by the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.

25.  From the CSRT transcript of Ammar Al Baluchi, the CIA redacted only a portion of one paragraph.  The information redacted from this paragraph was part of a statement provided by Khalid Sheikh Muhammad for and at the request of Ammar Al Baluchi to use in his CSRT hearing.  The CIA redacted intelligence information from this statement that was gained through the detention and interrogation of Khalid Sheikh Muhammad, which is properly classified as explained in Section IV.A.2. below.  In addition, the redacted information relates to a core function of the CIA and its personnel--collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that

is protected from disclosure by the National Security Act of
1947 and the Central Intelligence Agency Act of 1949.

26.  From the 50-page CSRT transcript of Majid Khan, the
CIA redacted several pages worth of information.  In addition to
statements by Majid Khan at the hearing, the CIA redacted
substantial portions of two exhibits offered by Majid Khan:  a
written "Statement of Torture" and an oral "Statement of
Torture," both of which were prepared in advance of the CSRT
hearing.  The information the CIA redacted from this transcript
was detailed information regarding the capture of Majid Khan,
the conditions and locations of his detention, interrogation
methods he claims to have experienced, intelligence information
gained through his detention and interrogation, and information
relating to foreign relations and foreign activities of the
United States.  This information is properly classified as
explained in Section IV.A.2. below.  In addition, the redacted
information relates to a core function of the CIA and its
personnel--collection, analysis, and dissemination of foreign
intelligence derived from clandestine intelligence activities,
sources, and methods--that is protected from disclosure by the
National Security Act of 1947 and the Central Intelligence
Agency Act of 1949.

27.  From the CSRT transcript of Khalid Sheikh Muhammad,
the CIA redacted information from several pages.  The CIA

redacted information regarding the conditions and locations of
his detention, the interrogation methods he claims to have
experienced, intelligence information gained through his
detention and interrogation, and information relating to foreign
relations and foreign activities of the United States.  Included
in the redacted information were specific questions posed to
Muhammad during his interrogation, which would reveal
intelligence interests of the CIA.  This information is properly
classified as explained in Section IV.A.2. below.  In addition,
the redacted information relates to a core function of the CIA
and its personnel--collection, analysis, and dissemination of
foreign intelligence derived from clandestine intelligence
activities, sources, and methods--that is protected from
disclosure by the National Security Act of 1947 and the Central
Intelligence Agency Act of 1949.

28.  The first redacted document responsive to Item 2 of
Plaintiffs' FOIA request is a "Written Statement Regarding
Alleged Abuse" prepared by Khalid Sheikh Muhammad and submitted
by him as an exhibit to his CSRT.  The statement is two pages,
and the CIA redacted all but the title and descriptive headers
on the document.  The information the CIA redacted is detailed
descriptions of Muhammad's capture, the conditions and locations
of his detention, including specific questions he was asked
during interrogation, and information relating to foreign

relations and foreign activities of the United States.  This
information is properly classified as explained in Section
IV.A.2. below.  In addition, the redacted information relates to
a core function of the CIA and its personnel--collection,
analysis, and dissemination of foreign intelligence derived from
clandestine intelligence activities, sources, and methods--that
is protected from disclosure by the National Security Act of
1947 and the Central Intelligence Agency Act of 1949.

29.  The second redacted document responsive to Item 2 of
Plaintiffs' FOIA request is a written statement prepared by
Hambali and submitted by him as an exhibit to his CSRT.  The
statement responds to specific points of evidence offered by the
CSRT Recorder.  The information redacted from the statement is
details of the conditions of his interrogation, including
specific questions he was asked.  In addition, the CIA redacted
information regarding his capture and detention, interrogation
methods he claims to have experienced, and information relating
to foreign relations and foreign activities of the United
States.  This information is properly classified as explained in
Section IV.A.2. below.  In addition, the redacted information
relates to a core function of the CIA and its personnel--
collection, analysis, and dissemination of foreign intelligence
derived from clandestine intelligence activities, sources, and
methods--that is protected from disclosure by the National

Security Act of 1947 and the Central Intelligence Agency Act of 1949.

30.  The third redacted document responsive to Item 2 of Plaintiffs' FOIA request is a written statement prepared by Bin Lap and submitted by him as an exhibit to his CSRT.  The statement responds to specific points of evidence offered by the CSRT Recorder.  The CIA redacted the entire substance of the statement, leaving the document's title and introduction.  The information the CIA redacted is intelligence information gained through the detention and interrogation of Bin Lap, which is properly classified as explained in Section IV.A.2. below.  In addition, the redacted information relates to a core function of the CIA and its personnel--collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that is protected from disclosure by the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.

## IV.  Applicable FOIA Exemptions

### A.  Exemption (b)(1)

31.  FOIA Exemption (b)(1) provides that FOIA does not require the production of records that are:

> (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and

        (B) are in fact properly classified pursuant to such
        Executive order.

5 U.S.C. § 552(b)(1).

        32.  The authority to classify information is derived from

a succession of Executive orders, the most recent of which is

Executive Order 12958.  I have reviewed the documents responsive

to Plaintiffs' FOIA request under the criteria established by

Executive Order 12958.  I have determined that the information

withheld from these documents is in fact properly classified

pursuant to the Order.

                **1.  Procedural Requirements**

        33.  Section 6.1(h) of the Executive Order defines

"classified national security information" or "classified

information" as "information that has been determined pursuant

to this order or any predecessor order to require protection

against unauthorized disclosure and is marked to indicate its

classified status when in documentary form."  Section 6.1(y) of

the Order defines "national security" as the "national defense

or foreign relations of the United States."

        34.  Section 1.1(a) of the Executive Order provides that

information may be originally classified under the terms of this

order only if all of the following conditions are met:

        (1) an original classification authority is
        classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order 12958, § 1.1(a).

35. *Original classification authority* – Section 1.3(a) of the Executive Order provides that the authority to classify information originally may be exercised only by the President and, in the performance of executive duties, the Vice President; agency heads and officials designated by the President in the *Federal Register;* and United States Government officials delegated this authority pursuant to section 1.3(c) of the Order. Section 1.3(b) of the Executive Order provides that original TOP SECRET classification authority includes the authority to classify information originally as SECRET and CONFIDENTIAL. Section 1.3(c)(2) provides that TOP SECRET original classification authority may be delegated only by the President; in the performance of executive duties, the Vice President; or an agency head or official designated pursuant to section 1.3(a)(2) of the Executive Order.

36.  In accordance with section 1.3(a)(2), the President designated the Director of the CIA as an official who may classify information originally as TOP SECRET.[3]  Under the authority of section 1.3(c)(2), the Director of the CIA has delegated original TOP SECRET classification authority to me. With respect to the information described below in this declaration relating to CIA intelligence activities, sources, and methods, I have determined that this information is properly classified TOP SECRET, SECRET, and/or CONFIDENTIAL by an original classification authority.

37.  *U.S. Government information* - Information may be originally classified only if the information is owned by, produced by or for, or is under the control of the United States Government.  With respect to the information relating to CIA intelligence activities, sources, and methods, and foreign relations and foreign activities, as described in section IV.A.2. of this declaration for which FOIA Exemption (b)(1) is asserted in this case, that information is owned by the U.S. Government, was produced by the U.S. Government, and is under the control of the U.S. Government.

---

[3] Order of President, Designation under Executive Order 12958, 70 Fed. Reg. 21,609 (Apr. 21, 2005), reprinted in 50 U.S.C.A. § 435 note at 205 (West Supp. 2008).  This order succeeded the prior Order of President, Officials Designated to Classify National Security Information, 60 Fed. Reg. 53,845 (Oct. 13, 1995), reprinted in 50 U.S.C.A. § 435 note at 486 (West 2003), in which the President similarly designated the Director of the CIA as an official who may classify information originally as TOP SECRET.

38.  *Categories in Section 1.4 of the Executive Order* -
With respect to the information relating to CIA intelligence
activities, sources, and methods, and foreign relations and
foreign activities, described in section IV.A.2. of this
declaration for which FOIA Exemption (b)(1) is asserted in this
case, that information falls within the following classification
categories in the Executive Order:  "information  . . .
concern[ing] . . . intelligence activities . . . [and]
intelligence sources or methods" [§ 1.4(c)]; and "foreign
relations or foreign activities of the United States"
[§ 1.4(d)].  I describe this information and its relation to the
national security below.

39.  *Damage to the national security* - Section 1.2(a) of
the Executive Order provides that information shall be
classified at one of three levels if the unauthorized disclosure
of the information reasonably could be expected to cause damage
to the national security, which includes defense against
transnational terrorism, and the original classification
authority is able to identify or describe the damage.
Information shall be classified TOP SECRET if its unauthorized
disclosure reasonably could be expected to result in
*exceptionally grave damage* to the national security; SECRET if
its unauthorized disclosure reasonably could be expected to
result in *serious damage* to the national security; and

CONFIDENTIAL if its unauthorized disclosure reasonably could be expected to result in *damage* to the national security.

40.  With respect to the information relating to CIA intelligence activities, sources, and methods, and foreign relations and foreign activities, described in section IV.A.2. of this declaration for which FOIA Exemption (b)(1) is asserted in this case, I have determined that this information is classified SECRET or TOP SECRET because it constitutes information the unauthorized disclosure of which reasonably could be expected to result in serious or exceptionally grave damage to the national security, which includes defense against transnational terrorism.  The damage to national security that reasonably could be expected to result from the unauthorized disclosure of this classified information is described below.

41.  *Proper purpose* - With respect to the information relating to CIA intelligence activities, sources, and methods, and foreign relations and foreign activities, described in section IV.A.2. of this declaration for which FOIA Exemption (b)(1) is asserted in this case, I have determined that this information has not been classified in order to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of

information that does not require protection in the interests of national security.

42.  *Marking* – With respect to the information relating to CIA intelligence activities, sources, and methods, and foreign relations and foreign activities, described in section IV.A.2. of this declaration for which FOIA Exemption (b)(1) is asserted in this case, I have reviewed the documents and have determined that they are properly marked in accordance with section 1.6 of the Executive Order.  Each document bears on its face the SECRET or TOP SECRET classification levels defined in section 1.2 of the order; the identity, by name or personal identifier and position, of the original classification authority or the name or personal identifier of the person derivatively classifying the document in accord with section 2.1 of the order; the agency and office of origin, if not otherwise evident; declassification instructions; and a concise reason for classification that, at a minimum, cites the applicable classification categories of section 1.4.[4]

43.  *Proper classification* – With respect to the information relating to CIA intelligence activities sources, and methods, and foreign relations and foreign activities, described

---

[4] Some of these documents also contain markings for "Special Access Programs," also known as "Sensitive Compartmented Information" or "SCI."  Section 4.4 of Executive Order 12958 establishes the legal requirements for establishing SCI programs.  Some of these markings are themselves classified and were redacted from the documents at issue.

in section IV.A.2. of this declaration for which FOIA Exemption
(b)(1) is asserted in this case, I have reviewed the documents
and has determined that they have been classified in accordance
with the substantive and procedural requirements of Executive
Order 12958 and that, therefore, they are currently and properly
classified.

### 2.  Substantive Requirements

44.  In processing the documents for this litigation, I
have reviewed the records identified as exempt under Exemption
(b)(1) in this declaration and have determined that they contain
information that is currently and properly classified.  I will
describe, to the greatest extent possible on the public record,
the damage to the national security that reasonably could be
expected to result form the unauthorized disclosure of this
information.

45.  In general, the fourteen HVDs included in Plaintiffs'
FOIA request have been exposed to intelligence activities,
sources, and methods and information relating to the foreign
relations and activities of the United States.  These
intelligence sources and methods are also classified
information, the disclosure of which reasonably could be
expected to result in serious or exceptionally grave damage to
the national security.  This information is also protected from
disclosure under the National Security Act of 1947 and the

Central Intelligence Agency Act of 1949, as discussed below.
The intelligence activities to which the HVDs were exposed
include the capture, detention, confinement, and interrogation
of detainees.  The information impacting foreign relations to
which the HVDs were exposed includes the locations of CIA
intelligence activities overseas and the assistance provided by
certain foreign governments in furtherance of those activities.
Detailed information in each of these areas is included in the
redacted documents responsive to Plaintiffs' FOIA request.

### a.  Intelligence Activities and Methods

46.  I will first provide a general description of
intelligence activities and their classified nature, and next
describe the specific information relating to intelligence
activities that the CIA redacted from the documents at issue in
this case.  Intelligence activities refer to the actual
implementation of intelligence sources and methods in the
operational context.  Intelligence activities are highly
sensitive because their disclosure often would reveal details
regarding specific intelligence collection activities.  The CIA
is charged with both foreign intelligence and
counterintelligence collection and analysis responsibilities.
Although it is obviously widely acknowledged that the CIA is
responsible for performing activities in support of this mission
for the United States, the CIA cannot confirm or deny the

existence of any specific intelligence collection or disclose the target of such intelligence gathering activities.

47. To disclose the existence (or non-existence) of a particular intelligence collection activity would reveal U.S. intelligence needs, priorities, and capabilities to a foreign intelligence service or hostile organization seeking to take advantage of any national security weakness. The damage that would be caused by such an admission is clear. Foreign government services and hostile organizations would be advised that their activities and information had been targeted by the CIA; future intelligence collection activities would be made more difficult by such a revelation; and, as a result, the conduct of such operations would become even more dangerous.

48. The redacted information at issue in this case concerns two specific intelligence activities: (1) the capture, detention, and confinement of terrorists; and (2) the interrogation of terrorists.

### (1)  Capture, Detention, and Conditions of Confinement

49. The redacted information at issue in this case relates to a highly classified CIA program to capture, detain, and interrogate key terrorist leaders and operatives in order to help prevent terrorist attacks (the "Program"). As part of this program, the President has authorized the CIA to set up

terrorist detention facilities outside the United States.  The
details of the program remain classified.  However, I will
attempt to provide, to the extent possible on the public record,
more detail regarding these specific intelligence activities of
the CIA, and how these documents relate to classified sources
and methods.

50.  On September 6, 2006, President George W. Bush
delivered a speech in which he disclosed the existence of the
Program.  President Bush also disclosed that fourteen
individuals formerly in CIA custody had been transferred to
Guantanamo Bay.[5]

51.  While the President publicly disclosed that the
fourteen individuals were detained and questioned outside the
United States in a program operated by the CIA, he also
explicitly stated that many specifics of the program, including
where the detainees had been held and the details of their
confinement, could not be divulged and would remain classified.
Among the details that cannot be publicly released are the
conditions of the detainees' capture, the employment of
alternative interrogation methods, and other operational
details.  In fact, such details constitute TOP SECRET, Sensitive
Compartmented Information (SCI).  It is these details that are

---

[5] Since the President's 6 September 2006 speech, the Government has disclosed
that two additional individuals were transferred to Guantanamo Bay.

redacted from the documents responsive to Plaintiffs' FOIA request.

52.  I have already described the levels of classification outlined in Executive Order 12958.  In addition to those levels of classification, Executive Order 12958, section 4.3, provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure.  The CIA is authorized to establish special access programs relating to intelligence activities, sources, and methods.  These special access programs relating to intelligence are called Sensitive Compartmented Information (SCI) programs.

53.  Information relating to the CIA terrorist detention program has been placed in a TOP SECRET//SCI program to enhance protection from unauthorized disclosure.  The unauthorized disclosure of the intelligence sources and methods relating to the Program reasonably could be expected to cause exceptionally grave damage to national security.  Specifically, disclosure of such information is reasonably likely to degrade the CIA's ability to effectively question terrorist detainees and elicit information necessary to protect the American people.

54.   The President made clear in his speech that operation
of the CIA Program will continue.   The continued effectiveness
of the CIA detention program requires the cooperation of foreign
governments and the use of effective interrogation techniques.
Unauthorized disclosure of the details of the program would
undermine both of these requirements.   These details are
included in the information redacted from the documents at issue
in this case.   Unauthorized disclosure of details regarding the
conditions of capture, conditions of detention and specific
alternative interrogation procedures reasonably could be
expected to result in exceptionally grave damage to the national
security.

> **(2)   Interrogation Methods, Questions, and
> Intelligence Collection**

55.   The interrogation methods used, questions asked, and
intelligence gained in the CIA's detention and interrogation
program and their protection as classified information are
critical to its success.   The U.S. Government is aware that al
Qaeda and other terrorists train in counter-interrogation
methods.   Public disclosure of the questioning procedures and
methods used by the CIA as part of the detention program would
allow al Qaeda and other terrorists to more effectively train to
resist such techniques, which would result in degradation in the
effectiveness of the techniques in the future.   If detainees in

the CIA program are more fully prepared to resist interrogation, it could prevent the CIA from obtaining vital intelligence that could disrupt future attacks. These interrogation methods are integral to the CIA's detention program and are therefore classified TOP SECRET//SCI.

56. The CIA's detention and interrogation program has provided the U.S. Government with one of the most useful tools in combating terrorist threats to the national security. It has shed light on probable targets and likely methods for attacks on the United States, and has led to the disruption of terrorist plots against the United States and its allies. For example, information obtained through the Program thwarted a plot to fly a plane into the tallest building in Los Angeles. Additional plots that were disrupted include hijacking passenger planes to fly into Heathrow Airport and the Canary Wharf in London and attacking the U.S. consulate in Karachi, Pakistan, using car bombs and motorcycle bombs. Additionally, information obtained through the program has played a vital role in the capture and questioning of additional senior al Qaeda operatives. For example, interrogations of detainees produced information that provided initial leads to the locations of al Qaeda operatives, which led to their capture. In addition, the United States gained valuable information that explained previously unknown

details of al Qaeda, such as its organization, financing,
communications, and logistics.

57.  In addition to interrogation methods generally, the
types of questions asked and specific questions asked to
particular detainees must be protected.  The questions asked
during interrogation could provide insight into the intelligence
interests and knowledge of the CIA.  Public disclosure of the
specific questions that the CIA has asked detainees could reveal
what the CIA knew at the time and allow others to infer what the
CIA did not know at the time.  This information would allow
other terrorists to make judgments about the intelligence
capabilities of the CIA and to anticipate the type of
questioning they might undergo.

58.  Although certain instances of intelligence gained
through interrogation methods have been publicly disclosed by
the U.S. Government, such as the examples above, the redacted
information remains classified.  Intelligence information gained
through interrogation is currently used by the U.S. Government
to conduct counterterrorism operations and pursue terrorists.
If the CIA were to reveal intelligence information gained
through its use of interrogation methods, the information would
no longer be useful in counterterrorism efforts.

b.    **Foreign Relations and Foreign Activities of the United States**

59.  Disclosure of the classified information regarding the Program contained in the classified documents is also reasonably likely to damage foreign relations.  Among the most critical sources and methods in the collection of foreign intelligence are the relationships that the United States maintains with the intelligence and security services of foreign countries. Through these intelligence liaison relationships, the CIA can collect intelligence and provide to U.S. national security and foreign policy officials information that is critical to informed decision making -- information that the CIA cannot obtain through other sources and methods.

60.  In this case, foreign governments have provided critical assistance to CIA counterterrorism operations, including but not limited to hosting of foreign detention facilities, under the condition that their assistance be kept secret.  Statements from the HVDs acknowledged to have been in the CIA's detention program about the specific foreign detention locations and other critical assistance that foreign countries have provided to the CIA's counterterrorism operations would damage the CIA's relations with these foreign governments and could cause them to cease cooperating with the CIA on such matters.  Such statements are among the redacted information in

the documents responsive to Plaintiffs' FOIA request.  If the
United States demonstrates that it is unwilling or unable to
stand by its commitments to foreign governments, they will be
less willing to cooperate with the United States on
counterterrorism activities.

61.  The damage to national security that could result
through public disclosure of the information regarding liaison
assistance contained in the documents at issue is not merely
conjectural.  Just prior to the President's 6 September 2006
speech announcing the transfer of detainees to Guantanamo Bay,
the CIA provided certain foreign governments specific assurances
that the CIA would protect the fact of their cooperation from
disclosure.  These liaison partners expressed their deep
appreciation and highlighted that their continued cooperation
was conditioned on the CIA's commitment and ability to keep
their assistance strictly confidential.

62.  In one instance, however, a particular foreign
government reduced its cooperation with the CIA when its role in
the terrorist detention program was leaked to a third country
whose national had been detained within the program.  The
foreign government lost the trust and cooperation of that third
country in matters of their own national security.  Repair of
the CIA's relationship with this foreign government came only
through the senior-level intervention of the CIA Director

personally apologizing for the leak.  Despite this significant
effort, to this day the damage this one incident has caused to
the CIA's relationship with the foreign government is
incalculable, as the CIA can never be sure to what extent the
foreign government is withholding vital intelligence necessary
to the national security of the United States.

63.  In sum, the CIA has determined that unauthorized
disclosure of information which reasonably could be expected to
lead to the identification of information that would harm
foreign relations or foreign activities of the United States, is
currently and properly classified as SECRET and/or TOP SECRET
pursuant to the criteria of Executive Order 12958, as its
disclosure could reasonably be expected to cause serious and
exceptionally grave damage to the national security of the
United States, and is thus exempt from disclosure pursuant to
FOIA Exemption (b)(1).

### c.    False Allegations by HVDs

64.  I wish to acknowledge that certain allegations made by
the HVDs in the documents at issue in this case may be false or
exaggerated.  Notwithstanding this, the HVDs are in a position
to provide accurate and detailed information about the CIA's
detention program.  As already stated, the disclosure of such
details reasonably could be expected to result in exceptionally
grave damage to national security.

65.   False or exaggerated allegations by the HVDs about the classified details of the Program, however, also must be treated as classified information.  To do otherwise would have the effect of allowing accurate, highly classified information about the Program to be revealed by the HVDs.  If only truthful statements were redacted, a detainee with knowledge of classified facts could easily manipulate the process to reveal those classified facts.  For example, if the United States redacted only the HVDs' true allegations regarding locations of CIA detention facilities, the true locations of these facilities could be revealed by making multiple allegations as to location, through a simple process of elimination.  The same is true with respect to conditions of confinement and interrogation methods. If only true statements about such conditions and techniques were redacted, HVDs with access to classified information regarding actual conditions and techniques could paint a picture of those conditions and technique used and not used by making repeated allegations about conditions of confinement and interrogation techniques.  In sum, the continued success of the Program depends as much on concealing what interrogation methods are not approved as it does on concealing what methods are approved.

66.   Allowing the HVDs to speak freely about the CIA program will allow them to directly reveal the classified

information about the Program that the Government must protect.

Redacting only true statements about the Program would allow

HVDs to manipulate the process and reveal the true details of

the program.  Therefore, in order to protect the classified

facts at issue here – the details of the CIA terrorist detention

and interrogation program – the Government must treat all

allegations by the HVDs regarding the program as classified.

**B.    Exemption (b)(3)**

67.    FOIA Exemption (b)(3) provides that the FOIA does not

apply to matters that are:

> specifically exempted from disclosure by statute (other
> than section 552b of this title), provided that such
> statute
>
>> (A) requires that the matters be withheld from
>> the public in such a manner as to leave no discretion
>> on the issue, or
>>
>> (B) establishes particular criteria for
>> withholding or refers to particular types of matters
>> to be withheld . . .

5 U.S.C. § 552(b)(3).  The CIA has reviewed the documents

responsive to Plaintiffs' FOIA Request and determined that there

are two relevant withholding statutes:  the National Security

Act of 1947 and the Central Intelligence Agency Act of 1949.

68.    *National Security Act of 1947* – Section 102A(i)(1) of

the National Security Act of 1947, as amended, 50 U.S.C.A.

§ 403-1(i)(1) (West Supp. 2008), provides that the Director of

National Intelligence (DNI) shall protect intelligence sources

and methods from unauthorized disclosure.  I have reviewed the documents identified as classified in this declaration and determined that they contain information that if disclosed would reveal intelligence sources and methods.

69.  *Central Intelligence Agency Act of 1949* – Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C.A. § 403g (West Supp. 2008), provides that in the interests of the security of the foreign intelligence activities of the United States and in order to further implement section 403-1(i) of Title 50, which provides that the DNI shall be responsible for the protection of intelligence sources and methods from unauthorized disclosure, the CIA shall be exempted from the provisions of any law which requires the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the CIA. Among the functions of the CIA are the collection, analysis, and dissemination of foreign intelligence.  The collection function includes the clandestine intelligence sources, methods, and activities by which the CIA collects foreign intelligence from human sources.  In this case, the information redacted from documents responsive to Plaintiffs' FOIA request contains details of critical functions of the CIA and its personnel.  As described above, each classified category of information contained in the documents at issue relates to the CIA's ability

to collect counterterrorism intelligence and perform counterterrorism operations--functions that reside at the core of the CIA's mission.

70.  In contrast to Executive Order 12958, the National Security Act's statutory requirement to protect intelligence sources and methods and the CIA Act's exemptions from disclosure of certain information do not require the CIA to identify or describe the damage to national security that reasonably could be expected to result from their unauthorized disclosure.  In any event, the information relating to intelligence sources and methods in these documents that is covered by the National Security Act and the CIA Act is the same as the information relating to intelligence sources and methods that is covered by the Executive Order for classified information.  Therefore, the damage to national security that reasonably could be expected to result from the unauthorized disclosure of such information relating to intelligence sources and methods is co-extensive with the damage that reasonably could be expected to result from the unauthorized disclosure of classified information.  This damage is described above in the section of this declaration describing the classified information at issue in the documents responsive to Plaintiffs' FOIA request.

## C.  Segregability

71.  As described previously, the CIA has released some records, in whole or in part, in response to Plaintiffs' FOIA request.  With respect to the records released in part, I conducted a line-by-line review of these documents to identify and release all reasonably segregable, non-exempt portions of the documents.  Based on this review, I determined that the information released to Plaintiffs could be released in segregable form while the remaining information is exempt from disclosure under FOIA exemptions (b)(1) and (b)(3), as explained above.

## V.  Conclusion

72.  For the reasons described above, the records described herein were withheld in whole or in part on the basis of FOIA exemptions (b)(1) and (b)(3).

*   *   *   *

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of June, 2008.


_____
Wendy M. Hilton
Associate Information Review Officer
National Clandestine Service
Central Intelligence Agency

**EXHIBIT A**

LEGAL DEPARTMENT



April 20, 2007

Department of Defense
Director, Freedom of Information and Security Review
1155 Defense Pentagon, Room 2C757
Washington, DC 20301-1155

Central Intelligence Agency
Information and Privacy Coordinator
Washington, DC 20505

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LEGAL DEPARTMENT
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
F/212.549.2651
WWW.ACLU.ORG

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

KENNETH B. CLARK
CHAIR, NATIONAL
ADVISORY COUNCIL

RICHARD ZACKS
TREASURER

Re:     **REQUEST UNDER FREEDOM OF INFORMATION ACT /**
     **Expedited Processing Requested**

Attention:

    This letter constitutes a request ("Request") pursuant to the
Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, and the
implementing regulations, 32 C.F.R. § 286.1 *et seq.*, and 32 C.F.R. § 1900
*et seq.* The Request is submitted on behalf of the American Civil Liberties
Union ("ACLU").

### Requested Records

    The ACLU seeks the following records relating to the hearings of
Abu Faraj al-Libi; Walid Bin Attash; Khalid Sheikh Muhammad; Ramzi
Bin al-Shib; Ahmed Khalfan Ghailani; Mohd Farik bin Amin "Zubair";
Mustafa Al Hawsawi; Al Nashiri, Abd Al Rahim Hussein Mohammed;
Bashir Bin Lap (AKA Lillie); Ammar Al Baluchi; Rjduan Bin Isomuddiiu
(AKA Hambali); Zayn Al Abidin Muhammad Husayn (AKA Zubaydah);
Majid Khan; and Gouled Hassan Dourad before the Combatant Status
Review Tribunals ("CSRT") at the U.S. Naval Base, Guantánamo Bay,
Cuba ("Guantánamo"):

    1.  Unredacted versions of CSRT hearing transcripts.[1]

    2.  Copies of all records provided to the CSRT by the
       detainees or their Personal Representative.

---

[1] This Request does not seek the names of the government personnel present at the
hearing.

3.  Copies of all records provided to the CSRT by the
    Recorder.

## Application for Expedited Processing

We request expedited processing pursuant to 5 U.S.C. §
552(a)(6)(E) and corresponding regulations. There is a "compelling need"
for these records because the information requested is urgently needed by
an organization primarily engaged in disseminating information in order to
inform the public about actual or alleged Federal government activity. 5
U.S.C. § 552(a)(6)(E)(v); 32 C.F.R. § 286.4(d)(3)(ii); 32 C.F.R. §
1900.34(c)(2). In addition, the records sought relate to a "breaking news
story of general public interest." 32 C.F.R. § 286.4(d)(3)(ii)(A).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The ACLU is "primarily engaged in disseminating information"
within the meaning of the statute and regulations. 5 U.S.C. §
552(a)(6)(E)(v); 32 C.F.R. § 286.4(d)(3)(ii); 32 C.F.R. 1900.34(c)(2).
Dissemination of information to the public is a critical and substantial
component of the ACLU's mission and work. *See ACLU v. Dep't of
Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004) (finding non-profit
public interest group that "gathers information of potential interest to a
segment of the public, uses its editorial skills to turn the raw material into
a distinct work, and distributes that work to an audience" to be "primarily
engaged in disseminating information" (internal citation omitted)).
Specifically, the ACLU publishes newsletters, news briefings, right-to-
know documents, and other educational and informational materials that
are broadly circulated to the public. Such material is widely available to
everyone, including individuals, tax-exempt organizations, not-for-profit
groups, law students and faculty, for no cost or for a nominal fee. The
ACLU also disseminates information through its heavily visited website,
www.aclu.org. The website addresses civil rights and civil liberties issues
in depth, provides features on civil rights and civil liberties issues in the
news, and contains many thousands of documents relating to the issues on
which the ACLU is focused. The website specifically includes features on
information obtained through the FOIA. *See, e.g.*,
www.aclu.org/torturefoia; www.aclu.org/spyfiles. The ACLU also
publishes an electronic newsletter, which is distributed to subscribers by e-
mail. Finally, the ACLU produces an in-depth television series on civil
liberties. The ACLU plans to disseminate to the public the information
gathered through the Request.[2]

---

[2] In addition to the national ACLU offices, there are 53 ACLU affiliate and national
chapter offices located throughout the United States and Puerto Rico. These offices
further disseminate ACLU material to local residents, schools, and organizations through
a variety of means, including their own websites, publications, and newsletters. Further,

Furthermore, the records sought directly relate to a breaking news story of general public interest that concerns actual or alleged Federal government activity; specifically, the records sought relate to the government's treatment and detention of alleged "enemy combatants" now held at Guantánamo, and the alleged abuse and torture of these prisoners while they were in CIA custody. *See* 32 C.F.R. § 286.4(d)(3)(ii)(A); 32 C.F.R 1900.34(c)(2).

The CSRT hearings process generally has received extensive media coverage since it resumed in early March 2007. *See, e.g.* Editorial, *No Justice at Guantanamo*, Newsday (New York), Apr. 7, 2007 at A14 (calling for Congress to revisit the idea of CSRTs); Editorial, *Guantanamo Follies*, New York Times, Apr. 6, 2007 at A18 (condemning the CSRT as a "kangaroo court"); Linda Greenhouse, *Supreme Court Turns Down Detainees' Habeas Corpus Case*, New York Times, Apr. 3, 2007 at A18 (explaining Supreme Court ruling that detainees must exhaust the D.C. Circuit appeals process before challenging CSRTs at the higher court); David G. Savage, *Justices Refuse Detainees*, Los Angeles Times, Apr. 3, 2007 at A12 (same); Linda Greenhouse, *Justices Weigh Opening New Phase on Guantanamo*, New York Times, Mar. 30, 2007 at A24 (describing limited review process open to detainees to challenge their CSRT designations); Adam Liptak, *New Justice System is a Work in Progress*, New York Times, Mar. 29, 2007 at A21 (questioning whether military commissions operate within "the shadow of the law"); Editorial, *The President's Prison*, New York Times, Mar. 25, 2007 § 4 at 11 (questioning reason for secrecy surrounding the CSRTs); Julian E. Barnes, *Secret Hearings for Top 9/11 Suspects*, Los Angeles Times, Mar. 13, 2007 at A11 (describing CSRT process and questioning whether information about detainee mistreatment will be redacted from transcripts); Mike Mount, *Pentagon: Key 9/11 Suspects Face Judges at Gitmo*, CNN, Mar. 12, 2007 (explaining that "it could be weeks before the outcomes [of the CSRT proceedings] are known"); Ben Fox, *U.S. Holds First Hearings for 'High-Value' Inmates*, Associated Press, Mar. 10, 2007 (quoting Associated Press letter of protest that "it would be an unconstitutional mistake to close the [CSRT] proceedings in their entirety"); Carol Rosenberg, *Detainee Hearings to Exclude Reporters*, Orlando Sentinel (Florida), Mar. 9, 2007 at A12 (expressing concern that "national security experts" will "scrub" CSRT transcripts of material of public interest); Julian E. Barnes, *Guantanamo Decision Is Under Fire*, Los Angeles

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

the ACLU makes archived material available at the American Civil Liberties Union Archives, Public Policy Papers, Department of Rare Books and Special Collections, Princeton University Library. ACLU publications are often disseminated to relevant groups across the country, which then further distribute them to their members or to other parties.

3

Times, Mar. 8, 2007 at A14 (citing criticism by former military lawyers and human rights organizations of Pentagon decision to close CSRT process); Andrew Buncombe, *Trials of Guantanamo Suspects Begin Without a Lawyer or Reporter in Sight*, The Independent (London), Mar. 8, 2007 at 28 (citing claim that CSRTs are "designed to obtain a pre-determined result"); Josh White, *Hearing for 14 Guantanamo Detainees to be Held in Secret, Officials Say*, Washington Post, Mar. 7, 2007 at A3 (explaining that current CSRTs are "the first...secret tribunals at Guanatanmo; similar proceeding for hundreds of detainees have been open to the news media"); *Administrative Tribunals to Begin for High-Value Guantanamo Detainees*, Financial Times, Mar. 6, 2007 (revealing defense officials' concerns that even though information presented is unclassified that "detainees, when given the chance to speak, will reveal information relevant to U.S. concerns and activities").

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

There has been particular interest in the hearings of the fourteen prisoners who were previously in CIA custody. *See, e.g.*, Josh Meyer, *Two Key Detainees Deny Terrorism*, Los Angeles Times, Apr. 13, 2007 at A12 (Ammar Al Baluchi, Rjduan Bin Isomuddiiu [Hambali]); Josh White, *Nephew of 9/11 Mastermind Denies Involvement in Attacks*, Washington Post, Apr. 13, 2007 at A11 (Ammar Al Baluchi, Hambali); Editorial, *Guantanamo Follies*, New York Times, Apr. 6, 2007 at A18 (Abd al-Rahim Al Nashiri [Al Nashiri]); *Detainee Alleges Abuse in CIA Prison*, Grand Rapid Press (Michigan), Mar. 31, 2007 at A9 (Al Nashiri); Adam Liptak, *Detainee Says Torture Led to Confessions*, New York Times, Mar. 31, 2007 at A10 (Al Nashiri); Josh Meyer, *Detainee Says Torture Made Him Confess*, Los Angeles Times, Mar. 31, 2007 at A1 (Al Nashiri, Khalid Sheikh Muhammad); Josh White and Ann Scott Tyson, *Detainee Alleges Abuse in CIA Prison*, Washington Post, Mar. 31, 2007 at A1 (Al Nashiri); Josh Meyer, *9/11 Suspect Denied He Served as Paymaster*, Los Angeles Times, Mar. 30, 2007 at A16 (Mustafa Al Hawsawi [Al Hawsawi]); Robert Burns, *Saudi Says He Got Cash from 9/11 Pair*, Star Ledger (New Jersey), Mar. 30, 2007 at 39 (Ramzi Bin al-Shib, Al Hawsawi, Khalid Sheikh Muhammad); *Suspect Denies Sending Money for 9/11*, United Press International, Mar. 30, 2007 (Al Hawsawi*)*; Josh White, *Alleged Sept. 11 Financier Tells Tribunal He Knew Little of Plot*, Washington Post, Mar. 30, 2007 at A2 (Al Hawsawi); Rochelle Riley, Editorial, *In Bush World, Take No Oaths*, Detroit Free Press (Michigan), Mar. 23, 2007 at 11 (Khalid Sheikh Muhammad); Carol Rosenberg, *Guantanamo Captive Apologizes for Bomb*, Miami Herald (Florida), Mar. 23, 2007 (Ahmed Khalfan Ghailani); Adam Liptak, *Qaeda Operative Admits Role in 3 Attacks, Transcript Shows*, New York Times, Mar. 20, 2007 at A10 (Walid Bin Attash, Khalid Sheikh Muhammad); Jerry Seper, *Gitmo Detainee Admits Cole Role*, Washington Times, Mar. 20, 2007 at A5 (Abu Faraj al-Libi, Ramzi Bin Al-Shib, Walid Bin Attash); Josh White, *Al-Qaeda Suspect Says He Planned Cole Attack*, Washington Post,

Mar. 20, 2007 at A1 (Khalid Sheikh Muhammad, Walid Bin Attash);
Laurie Mylroie, *What is Khalid Sheik Mohammed Saying?*, American
Spectator, Mar. 19, 2007 (Abu Faraj al-Libi, Khalid Sheikh Muhammad);
Carol Rosenberg, *Pentagon: Confession in Cole Blast*, Miami Herald
(Florida), Mar. 19, 2007 (Walid bin Attash); *9/11 Architect Confesses*,
Chicago Tribune, Mar. 15, 2007 at 1 (Abu Faraj al-Libi, Ramzi Bin al-
Shib, Khalid Sheikh Muhammad); Adam Liptak, *Suspected Leader of
Attacks on 9/11 is Said to Confess*, New York Times, Mar. 15, 2007 at A1
(Khalid Sheikh Muhammad); Ed Pilkington, *'I was Responsible for 9/11,
from A to Z,'* The Guardian (London), Mar. 15, 2007 (Khalid Sheikh
Muhammad); Carol Rosenberg, *Hearings Start Today in Secret*, Miami
Herald (Florida), Mar. 9, 2007 (Khalid Sheikh Muhammad).

Moreover, many recent accounts express concern that at least some
of these individuals have been tortured or subjected to interrogation
techniques that are prohibited by international and United States Law. *See,
e.g.*, Colin Freeze, *'High-Value' Detainee Rejects al-Qaeda doctrine*,
Globe and Mail (Canada), Apr. 17, 2007 at A5 (reporting that Abu
Zubaydah was subject to waterboarding); *Prisoner Denies Al-Qaida Link*,
Newsday (New York), Apr. 17, 2007 at A37 (noting that Abu Zubaydah
claimed to have made false confessions while being tortured); *U.S. Says
Detainee Admitted Plotting Cole, Embassy Attacks*, Star Ledger (New
Jersey), Mar. 20, 2007 at 5 (acknowledging public questions about validity
of the high value detainees' confessions under the influence of torture);
Josh White, *Al-Qaeda Suspect Says He Planned Cole Attack*, Washington
Post, Mar. 20, 2007 at A1 (pointing out impossibility of knowing whether
the detainees' confessions were influenced by past torture); Ed Pilkington,
*'I was Responsible for 9/11, from A to Z,'* The Guardian (London), Mar.
15, 2007 (describing use of waterboarding and other harsh interrogation
techniques against Khalid Sheik Muhammad); Warren P. Strobel,
*Pentagon Set to Begin Hearing for 14 Detainees*, Knight Ridder, Mar. 6,
2007 (noting that questions have been raised about the detainees' torture
during CIA detention); Mark Mazzetti, *Pentagon Revises Its Rules on
Prosecution of Terrorists*, New York Times, Jan. 19, 2007 at
A18(reporting that many of the detainees may have been subject to
interrogation methods like waterboarding); Josh Meyer and Greg Miller,
*The Prisoner Problem*, Los Angeles Times, Sept. 7, 2006 at A1 (noting
that unnamed officials have confirmed that the "alternative" interrogation
procedures used by the CIA with the detainees included waterboarding).

Some reports also suggest that the government is improperly
concealing allegations of torture and mistreatment by detainees by
redacting such allegations from the hearing transcripts. *See, e.g.*, William
Glaberson, *Detainee Denies Membership in Al Qaeda*, New York Times,
Apr. 17, 2007 at A12 (reporting that Zabaydah's response to question
about his treatment was redacted); Carol Rosenberg, *Detainee Denies*

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

*Allegiance to Bin Laden*, Miami Herald (Florida), Apr. 16, 2007 (characterizing Zabaydah's "censored" transcript as containing details about his torture by CIA agents); Adam Liptak, *Detainee Says Torture Led to Confessions*, New York Times, Mar. 31, 2007 at A10 (noting that following a question during Al Nashiri's hearing about the methods of torture used against him, "the four-paragraph passage…was redacted in six places"); Josh Meyer, *Detainee Says Torture Made Him Confess*, Los Angeles Times, Mar. 31, 2007 at A1 (stating that details of Al Nashiri's torture were not included in his CSRT transcript and that his claims "appear to be redacted by U.S. government censors"); Josh White and Ann Scott Tyson, *Detainee Alleges Abuse in CIA Prison*, Washington Post, Mar. 31, 2007 at A1 (pointing out that portions of Al Nashiri's transcript that appear to describe his torture were redacted); *9/11 Architect Confesses*, Chicago Tribune, Mar. 15, 2007 at 1 (noting that portions of Khaled Sheikh Muhammad's transcript were deleted, including his response to a question about torture); Adam Liptak, *Suspected Leader of Attacks on 9/11 is Said to Confess*, New York Times, Mar. 15, 2007 at A1 (suggesting that allegations of mistreatment were redacted from hearing transcript); *see also*, Editorial, *Top-Secret Torture*, Washington Post, Nov. 21, 2006 (arguing that the government's attempt to classify harsh interrogation techniques used against detainees makes its accountability impossible); Carol D. Leonnig and Eric Rich, *U.S. Tries to Muzzle Detainees About Interrogation Methods*, Washington Post, Nov. 4, 2006 at A24 (reporting the Bush administration's attempt to keep detainees from revealing the "alternative interrogation methods").

The requested records are urgently needed within the meaning of the applicable regulations in order to provide the public with information about the treatment and detention of prisoners in U.S. custody. 32 C.F.R. § 286.4(d)(3)(ii); 32 C.F.R. 1900.34(c)(2). The records requested are not sought for commercial use and the requesters plan to disseminate the information disclosed as a result of this FOIA request to the public at no cost.

### Application for Waiver or Limitation of Fees

We request a waiver of processing fees on the grounds that disclosure of the requested records is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii); 32 C.F.R. § 286.28(d); 32 C.F.R. 1900.13(b)(2).

Numerous news accounts reflect the considerable public interest in the records we seek. *See* cited articles, *supra*. Given the ongoing and widespread media attention to this issue, the records sought in the instant

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

6

Request will significantly contribute to public understanding of the operations and activities of the DoD and the CIA. 32 C.F.R. § 286.28(d); 32 C.F.R. 1900.13(b)(2). Moreover, as stated above, disclosure is not in the ACLU's commercial interest. Any information disclosed by the ACLU as a result of this FOIA request will be available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'" (citation omitted)).

We also request a limitation of document reproduction fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. Accordingly, fees associated with the processing of the Request should be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II); 32 C.F.R. § 286.28(e)(7); 32 C.F.R. § 1900.13(i)(2).[3]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The ACLU meets the statutory and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *National Security Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989); *cf. ACLU v. Dep't of Justice*, 321 F. Supp. 2d at 30 n.5 (finding non-profit public interest group to be "primarily engaged in disseminating information"). The ACLU is a "representative of the news media" for the same reasons it is "primarily engaged in the dissemination of information." *See Electronic Privacy Information Ctr. v. Dep't of Defense*, 241 F. Supp. 2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA).[4]

---

[3] In the case of DoD, we also seek a waiver of duplication fees. 32 C.F.R. § 286.28(e)(7). For the reasons described above, disclosure of the information sought is in the public interest and is likely to contribute significantly to public understanding of the operations or activities of the government. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II); 32 C.F.R. § 286.28(e)(7).

[4] On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU. For example, in May 2005, the United States Department of Commerce granted a fee waiver to the ACLU with respect to its request for information regarding the radio frequency identification chips in United States passports. In March 2005, the Department of State granted a fee waiver to the ACLU with regard to a request submitted that month regarding the use of immigration laws to exclude prominent non-citizen scholars and intellectuals from the country because of their political views, statements, or associations. Also, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in August of 2004. In addition, the Office of Science and Technology Policy

*    *    *

Pursuant to applicable statute and regulations, we expect the determination regarding expedited processing within 10 calendar days. *See* 5 U.S.C. § 552(a)(6)(E)(ii)(I); 32 C.F.R. § 286.4(d)(3); 32 C.F.R. 1900.34(c).

If the Request is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions to FOIA. We expect the release of all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

Thank you for your prompt attention to this matter. Please furnish all applicable records to:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Jameel Jaffer
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Sincerely,

JAMEEL JAFFER

---

in the Executive Office of the President said it would waive the fees associated with a FOIA request submitted by the ACLU in August 2003. In addition, three separate agencies – the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice – did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

**EXHIBIT B**

Central Intelligence Agency



Washington, D.C. 20505

MAY 0 4 2007

Mr. Jameel Jaffer
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

Reference: F-2007-01226

Dear Mr. Jaffer:

The office of the Information and Privacy Coordinator has received your 20 April 2007 Freedom of Information Act (FOIA) request for:

> **"the following records relating to the hearings of Abu Faraj al-Libi; Walid Bin Attash; Khalid Sheikh Muhammad; Ramzi Bin al-Shib; Ahmed Khalfan Ghailani; Mohd Farik bin Amin 'Zubair'; Mustafa Al Hawsawi; Al Nashiri, Abd Al Rahim Hussein Mohammed; Bashir Bin Lap (AKA Lillie); Ammar Al Baluchi; Rjduan Bin Isomuddiu (AKA Hambali); Zayn Al Abidin Muhammad Husayn (AKA Zubaydah); Majid Khan; and Gouled Hassan Dourad before the Combatant Status Review Tribunals ('CSRT') at the U.S. Naval Base, Guantánamo Bay, Cuba ('Guantánamo'):**
>
> **1. Unredacted versions of CSRT hearing transcripts.**
> **2. Copies of all records provided to the CSRT by the detainees or their Personal Representative.**
> **3. Copies of all records provided to the CSRT by the Recorder."**

We have assigned your request the reference number above. Please use this number when corresponding so that we can identify it easily.

We accept your request; it will be processed in accordance with the FOIA, 5 U.S.C. § 552, as amended, and the CIA Information Act, 50 U.S.C. § 431, as amended. Unless you object, we will limit our search to CIA-originated records existing through the date of

this acceptance letter. We are granting your request for expedited processing, and, as a matter of administrative discretion, no fees will be charged for this request.

Despite our best efforts, the large number of FOIA requests CIA receives has created unavoidable processing delays making it unlikely that we can respond within the 20 working days the FOIA requires. We will nonetheless process your request as quickly as we can consistent with its expedited status.

You have the right to consider our honest appraisal as a denial of your request and you may appeal to the Agency Release Panel. A more practical approach would permit us to continue processing your request and respond to you as soon as we can. You will retain your appeal rights and, once you receive the results of our search, can appeal at that time if you wish. We will proceed on that basis unless you object.

Sincerely,

Scott Koch
Information and Privacy Coordinator