IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION,    )
et al.,                            )
                                   )
          Plaintiffs,              )
                                   )
     v.                            ) Case 1:08-cv-00437
                                   )
DEPARTMENT OF DEFENSE, et al.,     )
                                   )
          Defendants.              )
_____    )


**DECLARATION OF WENDY M. HILTON**
**ASSOCIATE INFORMATION REVIEW OFFICER**
**NATIONAL CLANDESTINE SERVICE**
**CENTRAL INTELLIGENCE AGENCY**

I, WENDY M. HILTON, hereby declare and say:

1.  I am an Associate Information Review Officer (AIRO) for the National Clandestine Service (NCS) of the Central Intelligence Agency (CIA).  I was appointed to this position in March 2007.  I have held a variety of positions in the CIA since I became a staff officer in 1983.

2.  The NCS is the organization within the CIA responsible for conducting the CIA's foreign intelligence and counterintelligence activities; conducting special activities, including covert action; conducting liaison with foreign intelligence and security services; serving as the repository for foreign counterintelligence information; supporting

clandestine technical collection; and coordinating CIA support
to the Department of Defense.  Specifically, the NCS is
responsible for the conduct of foreign intelligence collection
activities through the clandestine use of human sources.

3.  As the AIRO, I am authorized to assess the current,
proper classification of CIA information based on the
classification criteria of Executive Order 12958, as amended,[1]
and applicable CIA regulations.  As part of my official duties,
I ensure that determinations such as the release or withholding
of information related to the CIA are proper and do not
jeopardize CIA interests, personnel, or facilities, and, on
behalf of the Director of the CIA, do not jeopardize CIA
intelligence activities, sources, or methods.  I am able to
describe, based on my experience, the damage to the national
security that reasonably could be expected to result from the
unauthorized disclosure of classified information.

4.  The CIA's Director of Information Management Services,
under authority delegated to him by the Associate Deputy
Director of the CIA, has appointed me Records Validation Officer
(RVO) for the purpose of this litigation.  As RVO, I am
authorized to have access to all CIA records on any subject

---

[1] Executive Order 12958 was amended by Executive Order 13292.  See Exec. Order
No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).  All citations to Exec. Order
No. 12958 are to the Order as amended by Exec. Order No. 13292.  See Exec.
Order No. 12958, 3 C.F.R. § 333 (1995), reprinted as amended in 50 U.S.C.A.
§ 435 note at 193 (West Supp. 2008).

relevant to this litigation, and am authorized to sign
declarations on behalf of the CIA regarding searches of CIA
records systems and the contents of records, including those
located in, or containing information under the cognizance of,
the NCS and CIA directorates other than the NCS.  For any
records containing information that does not originate in, or
come under the cognizance of, the NCS, I make the following
statements based on representations made to me in my capacity as
Records Validation Officer for the purpose of this litigation.

5.  As a senior CIA official and under a written delegation
of authority pursuant to section 1.3(c) of Executive Order
12958, as amended ("Executive Order 12958"), I hold original
classification authority at the TOP SECRET level.  I am
authorized, therefore, to conduct classification reviews and to
make original classification and declassification decisions.

6.  Through the exercise of my official duties, I am
familiar with this civil action.  I make the following
statements based upon my personal knowledge and information made
available to me in my official capacity.

7.  The purpose of this declaration is to describe, to the
greatest extent possible on the public record, the CIA's search
for documents responsive to Plaintiffs' FOIA request, the
documents located, and the FOIA exemptions upon which the CIA

relied to redact and withhold documents and information responsive to Plaintiffs' FOIA request.

8.   For the Court's convenience, I have divided this declaration into four parts:  (1) Plaintiffs' FOIA request and subsequent proceedings; (2) CIA's records systems and search for documents responsive to Plaintiffs' FOIA request; (3) a description of the information redacted from the documents responsive to Plaintiffs' FOIA request; and (4) applicable FOIA exemptions.  The third part of this declaration describes, to the extent possible in an unclassified manner, the information the CIA withheld from the responsive documents.  If the Court determines that it needs additional information about the withheld information in this litigation, I can provide a more detailed declaration.  However, that declaration would contain classified information and would have to be filed <u>ex</u> <u>parte</u> and under seal for the Court's <u>in</u> <u>camera</u> review.

**I.  Plaintiffs' FOIA Request and Subsequent Proceedings**

9.   By letter dated 20 April 2007, Plaintiffs submitted a FOIA request to the Department of Defense (DOD) and the CIA requesting documents relating to fourteen High-Value Detainees ("HVDs") detained at the United States Naval Base Guantánamo

Bay, Cuba.[2]  Each of these fourteen HVDs had a hearing in Spring 2007 before a Combatant Status Review Tribunal ("CSRT") in Guantánamo Bay.  Specifically, with respect to each of the fourteen HVDs, Plaintiffs requested:

> a.  Unredacted versions of the CSRT hearing transcripts;
>
> b.  Copies of all records provided to the CSRT by the detainees or their Personal Representative; and
>
> c.  Copies of all records provided to the CSRT by the Recorder.

10.  In addition, Plaintiffs' FOIA request included a request for expedited processing and a fee waiver.  A true and correct copy of the FOIA request is attached as Exhibit A.

11.  By letter dated 4 May 2007, the CIA acknowledged receipt of Plaintiffs' FOIA request and granted Plaintiffs' request for expedited processing and a fee waiver.  A true and correct copy of the CIA's 4 May 2007 letter is attached as Exhibit B.

12.  I understand that in May 2008 the Government and Plaintiffs agreed that this litigation would encompass only the first two items in Plaintiffs' FOIA request, and not the third item that requested records provided by the CSRT to the

---

[2] The fourteen HVDs that are the subject of Plaintiffs' FOIA request are Abu Faraj al-Libi, Walid Bin Attash, Khalid Sheikh Muhammad, Ramzi Bin al-Shibh, Ahmed Khalfan Ghailani, Mohd Farik bin Amin (known as Zubair), Mustafa Al Hawsawi, Abd Al Rahim Hussein Mohammed (known as Al Nashiri), Bashir Bin Lap (known as Lillie), Ammar Al Baluchi, Riduan Bin Isomuddin (known as Hambali), Zayn Al Abidin Muhammad Husayn (known as Abu Zubaydah), Majid Khan, and Guleed Hassan Ahmed.

Recorder.  I understand that the Government is filing a motion
for summary judgment.  This declaration is filed in support of
the Government's motion for summary judgment.

**II.  The CIA's Search for and Processing of Records Responsive
to Plaintiffs' FOIA Request**

13.  The CIA identified fourteen transcripts of CSRT
hearings as responsive to Plaintiffs' FOIA request.

14.  Separately from Plaintiffs' FOIA request and at DOD's
request, the CIA had conducted classification reviews of the
CSRT hearing transcripts for the fourteen HVDs.  During this
review the CIA determined that eight of the transcripts were
unclassified and six of the transcripts were classified.  The
CIA redacted classified information from the six classified
transcripts to produce redacted, unclassified versions of the
transcripts.  I understand that DOD posted all fourteen
transcripts--eight unclassified and six redacted--on DOD's
website, where they have been available to the public since
9 August 2007.

15.  In response to Plaintiffs' FOIA request, the CIA
reviewed the transcripts according to FOIA standards.  Based on
that review, the CIA determined that the information the CIA
originally redacted from the six transcripts could not be
publicly released and is appropriately exempt from disclosure

under FOIA exemptions (b)(1) and (b)(3), as discussed in detail below.

16.  After the CIA completed its review of the transcripts in response to Plaintiffs' FOIA request, the CIA transmitted the redacted transcripts to DOD for their release to Plaintiffs.  I understand that DOD released the transcripts to Plaintiffs on 13 June 2008.

17.  In addition to the CSRT transcripts, the CIA also identified documents submitted by the HVDs or their Personal Representatives to the CSRT, which are responsive to the second item in Plaintiffs' FOIA request.  Many of these documents, such as prepared statements by the HVDs, were read verbatim into the record of the CSRT and are contained in the transcript.  Based on my review of the CSRT transcripts and the documents submitted to the CSRT by the HVDs or their Personal Representative, I have determined that only five of these documents that are not publicly available were not included in the CSRT transcripts.

18.  These five documents are:

    a.  A one-page diary excerpt of Abu Zubaydah;

    b.  A two-page written statement of Khalid Sheikh Muhammad;

    c.  A seven-page written statement of Hambali;

    d.  Two pages of "Detainee Session Notes" prepared by the Personal Representative of Majid Khan and entered into evidence at his CSRT hearing; and

e.   A one-page written statement of Bin Lap
responding to particular items of evidence.

19.  The CIA processed these five documents in response to
Plaintiffs' FOIA request and determined that two of the
documents--items a. and d. above--could be released in full.
The remaining three documents contain information that is exempt
from disclosure pursuant to FOIA exemptions (b)(1) and (b)(3).
This information was redacted from the following three
documents:  the written statement of Khalid Sheikh Muhammad; the
written statement of Hambali; and the written statement of Bin
Lap.

20.  After the CIA completed the review of these five
documents, the CIA released them directly to Plaintiffs on 25
June 2008.

**III.  Document Redactions**

21.  As noted above, the CIA redacted information from six
of the fourteen CSRT transcripts and three of the five documents
responsive to Item 2 of Plaintiffs' FOIA request.  I will now
summarize the information redacted from each of these documents,
to the extent possible on the public record.

22.  From the CSRT transcript of Mustafa Al Hawsawi, the
CIA redacted only one sentence on page 24 of the transcript.
This sentence contains information regarding foreign relations
and foreign activities of the United States, which is properly

classified as explained in Section IV.A.2. below.  In addition,
the redacted information relates to a core function of the CIA
and its personnel--collection, analysis, and dissemination of
foreign intelligence derived from clandestine intelligence
activities, sources, and methods--that is protected from
disclosure by the National Security Act of 1947 and the Central
Intelligence Agency Act of 1949.

        23.  From the CSRT transcript of Al Nashiri, the CIA made
redactions on several pages.  The CIA redacted detailed
information from these pages regarding the detention of Al
Nashiri and the conditions of his confinement, as well as the
interrogation methods that he claims to have experienced and
intelligence information that Al Nashiri provided during his
detention and interrogation.  This information is properly
classified as explained in Section IV.A.2. below.  In addition,
the redacted information relates to a core function of the CIA
and its personnel--collection, analysis, and dissemination of
foreign intelligence derived from clandestine intelligence
activities, sources, and methods--that is protected from
disclosure by the National Security Act of 1947 and the Central
Intelligence Agency Act of 1949.

        24.  From the CSRT transcript of Abu Zubaydah, the CIA made
redactions on several pages.  The CIA redacted detailed
information from these pages regarding the detention of Abu

Zubaydah and the conditions of his confinement, as well as the interrogation methods that he claims to have experienced and intelligence information that Abu Zubaydah provided during his detention and interrogation.  This information is properly classified as explained in Section IV.A.2. below.  In addition, the redacted information relates to a core function of the CIA and its personnel--collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that is protected from disclosure by the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.

25.  From the CSRT transcript of Ammar Al Baluchi, the CIA redacted only a portion of one paragraph.  The information redacted from this paragraph was part of a statement provided by Khalid Sheikh Muhammad for and at the request of Ammar Al Baluchi to use in his CSRT hearing.  The CIA redacted intelligence information from this statement that was gained through the detention and interrogation of Khalid Sheikh Muhammad, which is properly classified as explained in Section IV.A.2. below.  In addition, the redacted information relates to a core function of the CIA and its personnel--collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that

is protected from disclosure by the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.

26.  From the 50-page CSRT transcript of Majid Khan, the CIA redacted several pages worth of information.  In addition to statements by Majid Khan at the hearing, the CIA redacted substantial portions of two exhibits offered by Majid Khan:  a written "Statement of Torture" and an oral "Statement of Torture," both of which were prepared in advance of the CSRT hearing.  The information the CIA redacted from this transcript was detailed information regarding the capture of Majid Khan, the conditions and locations of his detention, interrogation methods he claims to have experienced, intelligence information gained through his detention and interrogation, and information relating to foreign relations and foreign activities of the United States.  This information is properly classified as explained in Section IV.A.2. below.  In addition, the redacted information relates to a core function of the CIA and its personnel--collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that is protected from disclosure by the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.

27.  From the CSRT transcript of Khalid Sheikh Muhammad, the CIA redacted information from several pages.  The CIA

redacted information regarding the conditions and locations of his detention, the interrogation methods he claims to have experienced, intelligence information gained through his detention and interrogation, and information relating to foreign relations and foreign activities of the United States.  Included in the redacted information were specific questions posed to Muhammad during his interrogation, which would reveal intelligence interests of the CIA.  This information is properly classified as explained in Section IV.A.2. below.  In addition, the redacted information relates to a core function of the CIA and its personnel--collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that is protected from disclosure by the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.

28.  The first redacted document responsive to Item 2 of Plaintiffs' FOIA request is a "Written Statement Regarding Alleged Abuse" prepared by Khalid Sheikh Muhammad and submitted by him as an exhibit to his CSRT.  The statement is two pages, and the CIA redacted all but the title and descriptive headers on the document.  The information the CIA redacted is detailed descriptions of Muhammad's capture, the conditions and locations of his detention, including specific questions he was asked during interrogation, and information relating to foreign

relations and foreign activities of the United States.  This information is properly classified as explained in Section IV.A.2. below.  In addition, the redacted information relates to a core function of the CIA and its personnel--collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that is protected from disclosure by the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.

29.  The second redacted document responsive to Item 2 of Plaintiffs' FOIA request is a written statement prepared by Hambali and submitted by him as an exhibit to his CSRT.  The statement responds to specific points of evidence offered by the CSRT Recorder.  The information redacted from the statement is details of the conditions of his interrogation, including specific questions he was asked.  In addition, the CIA redacted information regarding his capture and detention, interrogation methods he claims to have experienced, and information relating to foreign relations and foreign activities of the United States.  This information is properly classified as explained in Section IV.A.2. below.  In addition, the redacted information relates to a core function of the CIA and its personnel-- collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that is protected from disclosure by the National

Security Act of 1947 and the Central Intelligence Agency Act of 1949.

30.   The third redacted document responsive to Item 2 of Plaintiffs' FOIA request is a written statement prepared by Bin Lap and submitted by him as an exhibit to his CSRT.   The statement responds to specific points of evidence offered by the CSRT Recorder.   The CIA redacted the entire substance of the statement, leaving the document's title and introduction.   The information the CIA redacted is intelligence information gained through the detention and interrogation of Bin Lap, which is properly classified as explained in Section IV.A.2. below.   In addition, the redacted information relates to a core function of the CIA and its personnel--collection, analysis, and dissemination of foreign intelligence derived from clandestine intelligence activities, sources, and methods--that is protected from disclosure by the National Security Act of 1947 and the Central Intelligence Agency Act of 1949.

**IV.  Applicable FOIA Exemptions**

    **A.  Exemption (b)(1)**

31.   FOIA Exemption (b)(1) provides that FOIA does not require the production of records that are:

> (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and

14

(B) are in fact properly classified pursuant to such
Executive order.

5 U.S.C. § 552(b)(1).

32.  The authority to classify information is derived from
a succession of Executive orders, the most recent of which is
Executive Order 12958.  I have reviewed the documents responsive
to Plaintiffs' FOIA request under the criteria established by
Executive Order 12958.  I have determined that the information
withheld from these documents is in fact properly classified
pursuant to the Order.

### 1.  Procedural Requirements

33.  Section 6.1(h) of the Executive Order defines
"classified national security information" or "classified
information" as "information that has been determined pursuant
to this order or any predecessor order to require protection
against unauthorized disclosure and is marked to indicate its
classified status when in documentary form."  Section 6.1(y) of
the Order defines "national security" as the "national defense
or foreign relations of the United States."

34.  Section 1.1(a) of the Executive Order provides that
information may be originally classified under the terms of this
order only if all of the following conditions are met:

(1) an original classification authority is
classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order 12958, § 1.1(a).

35. *Original classification authority* – Section 1.3(a) of the Executive Order provides that the authority to classify information originally may be exercised only by the President and, in the performance of executive duties, the Vice President; agency heads and officials designated by the President in the *Federal Register;* and United States Government officials delegated this authority pursuant to section 1.3(c) of the Order.  Section 1.3(b) of the Executive Order provides that original TOP SECRET classification authority includes the authority to classify information originally as SECRET and CONFIDENTIAL.  Section 1.3(c)(2) provides that TOP SECRET original classification authority may be delegated only by the President; in the performance of executive duties, the Vice President; or an agency head or official designated pursuant to section 1.3(a)(2) of the Executive Order.

36.   In accordance with section 1.3(a)(2), the President
designated the Director of the CIA as an official who may
classify information originally as TOP SECRET.[3]  Under the
authority of section 1.3(c)(2), the Director of the CIA has
delegated original TOP SECRET classification authority to me.
With respect to the information described below in this
declaration relating to CIA intelligence activities, sources,
and methods, I have determined that this information is properly
classified TOP SECRET, SECRET, and/or CONFIDENTIAL by an
original classification authority.

37.   *U.S. Government information* - Information may be
originally classified only if the information is owned by,
produced by or for, or is under the control of the United States
Government.  With respect to the information relating to CIA
intelligence activities, sources, and methods, and foreign
relations and foreign activities, as described in section
IV.A.2. of this declaration for which FOIA Exemption (b)(1) is
asserted in this case, that information is owned by the U.S.
Government, was produced by the U.S. Government, and is under
the control of the U.S. Government.

---

[3] Order of President, Designation under Executive Order 12958, 70 Fed. Reg.
21,609 (Apr. 21, 2005), reprinted in 50 U.S.C.A. § 435 note at 205 (West
Supp. 2008).  This order succeeded the prior Order of President, Officials
Designated to Classify National Security Information, 60 Fed. Reg. 53,845
(Oct. 13, 1995), reprinted in 50 U.S.C.A. § 435 note at 486 (West 2003), in
which the President similarly designated the Director of the CIA as an
official who may classify information originally as TOP SECRET.

38.  *Categories in Section 1.4 of the Executive Order* -
With respect to the information relating to CIA intelligence
activities, sources, and methods, and foreign relations and
foreign activities, described in section IV.A.2. of this
declaration for which FOIA Exemption (b)(1) is asserted in this
case, that information falls within the following classification
categories in the Executive Order:  "information  . . .
concern[ing] . . . intelligence activities . . . [and]
intelligence sources or methods" [§ 1.4(c)]; and "foreign
relations or foreign activities of the United States"
[§ 1.4(d)].  I describe this information and its relation to the
national security below.

39.  *Damage to the national security* - Section 1.2(a) of
the Executive Order provides that information shall be
classified at one of three levels if the unauthorized disclosure
of the information reasonably could be expected to cause damage
to the national security, which includes defense against
transnational terrorism, and the original classification
authority is able to identify or describe the damage.
Information shall be classified TOP SECRET if its unauthorized
disclosure reasonably could be expected to result in
*exceptionally grave damage* to the national security; SECRET if
its unauthorized disclosure reasonably could be expected to
result in *serious damage* to the national security; and

CONFIDENTIAL if its unauthorized disclosure reasonably could be expected to result in *damage* to the national security.

40.  With respect to the information relating to CIA intelligence activities, sources, and methods, and foreign relations and foreign activities, described in section IV.A.2. of this declaration for which FOIA Exemption (b)(1) is asserted in this case, I have determined that this information is classified SECRET or TOP SECRET because it constitutes information the unauthorized disclosure of which reasonably could be expected to result in serious or exceptionally grave damage to the national security, which includes defense against transnational terrorism.  The damage to national security that reasonably could be expected to result from the unauthorized disclosure of this classified information is described below.

41.  *Proper purpose* – With respect to the information relating to CIA intelligence activities, sources, and methods, and foreign relations and foreign activities, described in section IV.A.2. of this declaration for which FOIA Exemption (b)(1) is asserted in this case, I have determined that this information has not been classified in order to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of

information that does not require protection in the interests of national security.

42. *Marking* – With respect to the information relating to CIA intelligence activities, sources, and methods, and foreign relations and foreign activities, described in section IV.A.2. of this declaration for which FOIA Exemption (b)(1) is asserted in this case, I have reviewed the documents and have determined that they are properly marked in accordance with section 1.6 of the Executive Order.  Each document bears on its face the SECRET or TOP SECRET classification levels defined in section 1.2 of the order; the identity, by name or personal identifier and position, of the original classification authority or the name or personal identifier of the person derivatively classifying the document in accord with section 2.1 of the order; the agency and office of origin, if not otherwise evident; declassification instructions; and a concise reason for classification that, at a minimum, cites the applicable classification categories of section 1.4.[4]

43. *Proper classification* – With respect to the information relating to CIA intelligence activities sources, and methods, and foreign relations and foreign activities, described

_____

[4] Some of these documents also contain markings for "Special Access Programs," also known as "Sensitive Compartmented Information" or "SCI."  Section 4.4 of Executive Order 12958 establishes the legal requirements for establishing SCI programs.  Some of these markings are themselves classified and were redacted from the documents at issue.

in section IV.A.2. of this declaration for which FOIA Exemption
(b)(1) is asserted in this case, I have reviewed the documents
and has determined that they have been classified in accordance
with the substantive and procedural requirements of Executive
Order 12958 and that, therefore, they are currently and properly
classified.

### 2.  Substantive Requirements

44.  In processing the documents for this litigation, I
have reviewed the records identified as exempt under Exemption
(b)(1) in this declaration and have determined that they contain
information that is currently and properly classified.  I will
describe, to the greatest extent possible on the public record,
the damage to the national security that reasonably could be
expected to result form the unauthorized disclosure of this
information.

45.  In general, the fourteen HVDs included in Plaintiffs'
FOIA request have been exposed to intelligence activities,
sources, and methods and information relating to the foreign
relations and activities of the United States.  These
intelligence sources and methods are also classified
information, the disclosure of which reasonably could be
expected to result in serious or exceptionally grave damage to
the national security.  This information is also protected from
disclosure under the National Security Act of 1947 and the

Central Intelligence Agency Act of 1949, as discussed below.
The intelligence activities to which the HVDs were exposed
include the capture, detention, confinement, and interrogation
of detainees.  The information impacting foreign relations to
which the HVDs were exposed includes the locations of CIA
intelligence activities overseas and the assistance provided by
certain foreign governments in furtherance of those activities.
Detailed information in each of these areas is included in the
redacted documents responsive to Plaintiffs' FOIA request.

### a.   Intelligence Activities and Methods

46.  I will first provide a general description of
intelligence activities and their classified nature, and next
describe the specific information relating to intelligence
activities that the CIA redacted from the documents at issue in
this case.  Intelligence activities refer to the actual
implementation of intelligence sources and methods in the
operational context.  Intelligence activities are highly
sensitive because their disclosure often would reveal details
regarding specific intelligence collection activities.  The CIA
is charged with both foreign intelligence and
counterintelligence collection and analysis responsibilities.
Although it is obviously widely acknowledged that the CIA is
responsible for performing activities in support of this mission
for the United States, the CIA cannot confirm or deny the

existence of any specific intelligence collection or disclose
the target of such intelligence gathering activities.

47.  To disclose the existence (or non-existence) of a
particular intelligence collection activity would reveal U.S.
intelligence needs, priorities, and capabilities to a foreign
intelligence service or hostile organization seeking to take
advantage of any national security weakness.  The damage that
would be caused by such an admission is clear.  Foreign
government services and hostile organizations would be advised
that their activities and information had been targeted by the
CIA; future intelligence collection activities would be made
more difficult by such a revelation; and, as a result, the
conduct of such operations would become even more dangerous.

48.  The redacted information at issue in this case
concerns two specific intelligence activities:  (1) the capture,
detention, and confinement of terrorists; and (2) the
interrogation of terrorists.

### (1)  Capture, Detention, and Conditions of Confinement

49.  The redacted information at issue in this case relates
to a highly classified CIA program to capture, detain, and
interrogate key terrorist leaders and operatives in order to
help prevent terrorist attacks (the "Program").  As part of this
program, the President has authorized the CIA to set up

terrorist detention facilities outside the United States.  The details of the program remain classified.  However, I will attempt to provide, to the extent possible on the public record, more detail regarding these specific intelligence activities of the CIA, and how these documents relate to classified sources and methods.

50.  On September 6, 2006, President George W. Bush delivered a speech in which he disclosed the existence of the Program.  President Bush also disclosed that fourteen individuals formerly in CIA custody had been transferred to Guantanamo Bay.[5]

51.  While the President publicly disclosed that the fourteen individuals were detained and questioned outside the United States in a program operated by the CIA, he also explicitly stated that many specifics of the program, including where the detainees had been held and the details of their confinement, could not be divulged and would remain classified. Among the details that cannot be publicly released are the conditions of the detainees' capture, the employment of alternative interrogation methods, and other operational details.  In fact, such details constitute TOP SECRET, Sensitive Compartmented Information (SCI).  It is these details that are

---

[5] Since the President's 6 September 2006 speech, the Government has disclosed that two additional individuals were transferred to Guantanamo Bay.

redacted from the documents responsive to Plaintiffs' FOIA request.

52.  I have already described the levels of classification outlined in Executive Order 12958.  In addition to those levels of classification, Executive Order 12958, section 4.3, provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure.  The CIA is authorized to establish special access programs relating to intelligence activities, sources, and methods.  These special access programs relating to intelligence are called Sensitive Compartmented Information (SCI) programs.

53.  Information relating to the CIA terrorist detention program has been placed in a TOP SECRET//SCI program to enhance protection from unauthorized disclosure.  The unauthorized disclosure of the intelligence sources and methods relating to the Program reasonably could be expected to cause exceptionally grave damage to national security.  Specifically, disclosure of such information is reasonably likely to degrade the CIA's ability to effectively question terrorist detainees and elicit information necessary to protect the American people.

54.   The President made clear in his speech that operation of the CIA Program will continue.   The continued effectiveness of the CIA detention program requires the cooperation of foreign governments and the use of effective interrogation techniques. Unauthorized disclosure of the details of the program would undermine both of these requirements.   These details are included in the information redacted from the documents at issue in this case.   Unauthorized disclosure of details regarding the conditions of capture, conditions of detention and specific alternative interrogation procedures reasonably could be expected to result in exceptionally grave damage to the national security.

> **(2)   Interrogation Methods, Questions, and Intelligence Collection**

55.   The interrogation methods used, questions asked, and intelligence gained in the CIA's detention and interrogation program and their protection as classified information are critical to its success.   The U.S. Government is aware that al Qaeda and other terrorists train in counter-interrogation methods.   Public disclosure of the questioning procedures and methods used by the CIA as part of the detention program would allow al Qaeda and other terrorists to more effectively train to resist such techniques, which would result in degradation in the effectiveness of the techniques in the future.   If detainees in

the CIA program are more fully prepared to resist interrogation,
it could prevent the CIA from obtaining vital intelligence that
could disrupt future attacks.  These interrogation methods are
integral to the CIA's detention program and are therefore
classified TOP SECRET//SCI.

    56.  The CIA's detention and interrogation program has
provided the U.S. Government with one of the most useful tools
in combating terrorist threats to the national security.  It has
shed light on probable targets and likely methods for attacks on
the United States, and has led to the disruption of terrorist
plots against the United States and its allies.  For example,
information obtained through the Program thwarted a plot to fly
a plane into the tallest building in Los Angeles.  Additional
plots that were disrupted include hijacking passenger planes to
fly into Heathrow Airport and the Canary Wharf in London and
attacking the U.S. consulate in Karachi, Pakistan, using car
bombs and motorcycle bombs.  Additionally, information obtained
through the program has played a vital role in the capture and
questioning of additional senior al Qaeda operatives.  For
example, interrogations of detainees produced information that
provided initial leads to the locations of al Qaeda operatives,
which led to their capture.  In addition, the United States
gained valuable information that explained previously unknown

details of al Qaeda, such as its organization, financing, communications, and logistics.

57.  In addition to interrogation methods generally, the types of questions asked and specific questions asked to particular detainees must be protected.  The questions asked during interrogation could provide insight into the intelligence interests and knowledge of the CIA.  Public disclosure of the specific questions that the CIA has asked detainees could reveal what the CIA knew at the time and allow others to infer what the CIA did not know at the time.  This information would allow other terrorists to make judgments about the intelligence capabilities of the CIA and to anticipate the type of questioning they might undergo.

58.  Although certain instances of intelligence gained through interrogation methods have been publicly disclosed by the U.S. Government, such as the examples above, the redacted information remains classified.  Intelligence information gained through interrogation is currently used by the U.S. Government to conduct counterterrorism operations and pursue terrorists. If the CIA were to reveal intelligence information gained through its use of interrogation methods, the information would no longer be useful in counterterrorism efforts.

b.   **Foreign Relations and Foreign Activities of the United States**

59.   Disclosure of the classified information regarding the Program contained in the classified documents is also reasonably likely to damage foreign relations.  Among the most critical sources and methods in the collection of foreign intelligence are the relationships that the United States maintains with the intelligence and security services of foreign countries. Through these intelligence liaison relationships, the CIA can collect intelligence and provide to U.S. national security and foreign policy officials information that is critical to informed decision making -- information that the CIA cannot obtain through other sources and methods.

60.   In this case, foreign governments have provided critical assistance to CIA counterterrorism operations, including but not limited to hosting of foreign detention facilities, under the condition that their assistance be kept secret.  Statements from the HVDs acknowledged to have been in the CIA's detention program about the specific foreign detention locations and other critical assistance that foreign countries have provided to the CIA's counterterrorism operations would damage the CIA's relations with these foreign governments and could cause them to cease cooperating with the CIA on such matters.  Such statements are among the redacted information in

the documents responsive to Plaintiffs' FOIA request.  If the
United States demonstrates that it is unwilling or unable to
stand by its commitments to foreign governments, they will be
less willing to cooperate with the United States on
counterterrorism activities.

61.  The damage to national security that could result
through public disclosure of the information regarding liaison
assistance contained in the documents at issue is not merely
conjectural.  Just prior to the President's 6 September 2006
speech announcing the transfer of detainees to Guantanamo Bay,
the CIA provided certain foreign governments specific assurances
that the CIA would protect the fact of their cooperation from
disclosure.  These liaison partners expressed their deep
appreciation and highlighted that their continued cooperation
was conditioned on the CIA's commitment and ability to keep
their assistance strictly confidential.

62.  In one instance, however, a particular foreign
government reduced its cooperation with the CIA when its role in
the terrorist detention program was leaked to a third country
whose national had been detained within the program.  The
foreign government lost the trust and cooperation of that third
country in matters of their own national security.  Repair of
the CIA's relationship with this foreign government came only
through the senior-level intervention of the CIA Director

personally apologizing for the leak.  Despite this significant effort, to this day the damage this one incident has caused to the CIA's relationship with the foreign government is incalculable, as the CIA can never be sure to what extent the foreign government is withholding vital intelligence necessary to the national security of the United States.

63.  In sum, the CIA has determined that unauthorized disclosure of information which reasonably could be expected to lead to the identification of information that would harm foreign relations or foreign activities of the United States, is currently and properly classified as SECRET and/or TOP SECRET pursuant to the criteria of Executive Order 12958, as its disclosure could reasonably be expected to cause serious and exceptionally grave damage to the national security of the United States, and is thus exempt from disclosure pursuant to FOIA Exemption (b)(1).

### c.    False Allegations by HVDs

64.  I wish to acknowledge that certain allegations made by the HVDs in the documents at issue in this case may be false or exaggerated.  Notwithstanding this, the HVDs are in a position to provide accurate and detailed information about the CIA's detention program.  As already stated, the disclosure of such details reasonably could be expected to result in exceptionally grave damage to national security.

65.   False or exaggerated allegations by the HVDs about the classified details of the Program, however, also must be treated as classified information.  To do otherwise would have the effect of allowing accurate, highly classified information about the Program to be revealed by the HVDs.  If only truthful statements were redacted, a detainee with knowledge of classified facts could easily manipulate the process to reveal those classified facts.  For example, if the United States redacted only the HVDs' true allegations regarding locations of CIA detention facilities, the true locations of these facilities could be revealed by making multiple allegations as to location, through a simple process of elimination.  The same is true with respect to conditions of confinement and interrogation methods. If only true statements about such conditions and techniques were redacted, HVDs with access to classified information regarding actual conditions and techniques could paint a picture of those conditions and technique used and not used by making repeated allegations about conditions of confinement and interrogation techniques.  In sum, the continued success of the Program depends as much on concealing what interrogation methods are not approved as it does on concealing what methods are approved.

66.   Allowing the HVDs to speak freely about the CIA program will allow them to directly reveal the classified

information about the Program that the Government must protect.
Redacting only true statements about the Program would allow
HVDs to manipulate the process and reveal the true details of
the program.  Therefore, in order to protect the classified
facts at issue here – the details of the CIA terrorist detention
and interrogation program – the Government must treat all
allegations by the HVDs regarding the program as classified.

   **B.   Exemption (b)(3)**

   67.  FOIA Exemption (b)(3) provides that the FOIA does not
apply to matters that are:

> specifically exempted from disclosure by statute (other
> than section 552b of this title), provided that such
> statute
>
>    (A) requires that the matters be withheld from
>    the public in such a manner as to leave no discretion
>    on the issue, or
>
>    (B) establishes particular criteria for
>    withholding or refers to particular types of matters
>    to be withheld . . .

5 U.S.C. § 552(b)(3).  The CIA has reviewed the documents
responsive to Plaintiffs' FOIA Request and determined that there
are two relevant withholding statutes:  the National Security
Act of 1947 and the Central Intelligence Agency Act of 1949.

   68.  *National Security Act of 1947* – Section 102A(i)(1) of
the National Security Act of 1947, as amended, 50 U.S.C.A.
§ 403-1(i)(1) (West Supp. 2008), provides that the Director of
National Intelligence (DNI) shall protect intelligence sources

and methods from unauthorized disclosure.  I have reviewed the documents identified as classified in this declaration and determined that they contain information that if disclosed would reveal intelligence sources and methods.

69.  *Central Intelligence Agency Act of 1949* – Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C.A. § 403g (West Supp. 2008), provides that in the interests of the security of the foreign intelligence activities of the United States and in order to further implement section 403-1(i) of Title 50, which provides that the DNI shall be responsible for the protection of intelligence sources and methods from unauthorized disclosure, the CIA shall be exempted from the provisions of any law which requires the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the CIA. Among the functions of the CIA are the collection, analysis, and dissemination of foreign intelligence.  The collection function includes the clandestine intelligence sources, methods, and activities by which the CIA collects foreign intelligence from human sources.  In this case, the information redacted from documents responsive to Plaintiffs' FOIA request contains details of critical functions of the CIA and its personnel.  As described above, each classified category of information contained in the documents at issue relates to the CIA's ability

to collect counterterrorism intelligence and perform
counterterrorism operations--functions that reside at the core
of the CIA's mission.

70.  In contrast to Executive Order 12958, the National
Security Act's statutory requirement to protect intelligence
sources and methods and the CIA Act's exemptions from disclosure
of certain information do not require the CIA to identify or
describe the damage to national security that reasonably could
be expected to result from their unauthorized disclosure.  In
any event, the information relating to intelligence sources and
methods in these documents that is covered by the National
Security Act and the CIA Act is the same as the information
relating to intelligence sources and methods that is covered by
the Executive Order for classified information.  Therefore, the
damage to national security that reasonably could be expected to
result from the unauthorized disclosure of such information
relating to intelligence sources and methods is co-extensive
with the damage that reasonably could be expected to result from
the unauthorized disclosure of classified information.  This
damage is described above in the section of this declaration
describing the classified information at issue in the documents
responsive to Plaintiffs' FOIA request.

**C.   Segregability**

71.   As described previously, the CIA has released some records, in whole or in part, in response to Plaintiffs' FOIA request.   With respect to the records released in part, I conducted a line-by-line review of these documents to identify and release all reasonably segregable, non-exempt portions of the documents.   Based on this review, I determined that the information released to Plaintiffs could be released in segregable form while the remaining information is exempt from disclosure under FOIA exemptions (b)(1) and (b)(3), as explained above.

**V.   Conclusion**

72.   For the reasons described above, the records described herein were withheld in whole or in part on the basis of FOIA exemptions (b)(1) and (b)(3).

\* \* \* \*

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of June, 2008.

_Wendy M. Hilton_
Wendy M. Hilton
Associate Information Review Officer
National Clandestine Service
Central Intelligence Agency

# EXHIBIT A

**LEGAL DEPARTMENT**



April 20, 2007

Department of Defense
Director, Freedom of Information and Security Review
1155 Defense Pentagon, Room 2C757
Washington, DC 20301-1155

Central Intelligence Agency
Information and Privacy Coordinator
Washington, DC 20505

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LEGAL DEPARTMENT
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
F/212.549.2651
WWW.ACLU.ORG

OFFICERS AND DIRECTORS
NADINE STROSSEN
*PRESIDENT*

ANTHONY D. ROMERO
*EXECUTIVE DIRECTOR*

KENNETH B. CLARK
CHAIR, NATIONAL
*ADVISORY COUNCIL*

RICHARD ZACKS
*TREASURER*

Re:   <u>**REQUEST UNDER FREEDOM OF INFORMATION ACT /**</u>
      <u>**Expedited Processing Requested**</u>

Attention:

        This letter constitutes a request ("Request") pursuant to the
Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, and the
implementing regulations, 32 C.F.R. § 286.1 *et seq.*, and 32 C.F.R. § 1900
*et seq.*  The Request is submitted on behalf of the American Civil Liberties
Union ("ACLU").

                            **Requested Records**

        The ACLU seeks the following records relating to the hearings of
Abu Faraj al-Libi; Walid Bin Attash; Khalid Sheikh Muhammad; Ramzi
Bin al-Shib; Ahmed Khalfan Ghailani; Mohd Farik bin Amin "Zubair";
Mustafa Al Hawsawi; Al Nashiri, Abd Al Rahim Hussein Mohammed;
Bashir Bin Lap (AKA Lillie); Ammar Al Baluchi; Rjduan Bin Isomuddiiu
(AKA Hambali); Zayn Al Abidin Muhammad Husayn (AKA Zubaydah);
Majid Khan; and Gouled Hassan Dourad before the Combatant Status
Review Tribunals ("CSRT") at the U.S. Naval Base, Guantánamo Bay,
Cuba ("Guantánamo"):

        1.  Unredacted versions of CSRT hearing transcripts.[1]

        2.  Copies of all records provided to the CSRT by the
            detainees or their Personal Representative.

───────────────

[1] This Request does not seek the names of the government personnel present at the
hearing.

3. Copies of all records provided to the CSRT by the
Recorder.

### Application for Expedited Processing

We request expedited processing pursuant to 5 U.S.C. §
552(a)(6)(E) and corresponding regulations. There is a "compelling need"
for these records because the information requested is urgently needed by
an organization primarily engaged in disseminating information in order to
inform the public about actual or alleged Federal government activity. 5
U.S.C. § 552(a)(6)(E)(v); 32 C.F.R. § 286.4(d)(3)(ii); 32 C.F.R. §
1900.34(c)(2). In addition, the records sought relate to a "breaking news
story of general public interest." 32 C.F.R. § 286.4(d)(3)(ii)(A).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The ACLU is "primarily engaged in disseminating information"
within the meaning of the statute and regulations. 5 U.S.C. §
552(a)(6)(E)(v); 32 C.F.R. § 286.4(d)(3)(ii); 32 C.F.R. 1900.34(c)(2).
Dissemination of information to the public is a critical and substantial
component of the ACLU's mission and work. *See ACLU v. Dep't of
Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004) (finding non-profit
public interest group that "gathers information of potential interest to a
segment of the public, uses its editorial skills to turn the raw material into
a distinct work, and distributes that work to an audience" to be "primarily
engaged in disseminating information" (internal citation omitted)).
Specifically, the ACLU publishes newsletters, news briefings, right-to-
know documents, and other educational and informational materials that
are broadly circulated to the public. Such material is widely available to
everyone, including individuals, tax-exempt organizations, not-for-profit
groups, law students and faculty, for no cost or for a nominal fee. The
ACLU also disseminates information through its heavily visited website,
www.aclu.org. The website addresses civil rights and civil liberties issues
in depth, provides features on civil rights and civil liberties issues in the
news, and contains many thousands of documents relating to the issues on
which the ACLU is focused. The website specifically includes features on
information obtained through the FOIA. *See, e.g.*,
www.aclu.org/torturefoia; www.aclu.org/spyfiles. The ACLU also
publishes an electronic newsletter, which is distributed to subscribers by e-
mail. Finally, the ACLU produces an in-depth television series on civil
liberties. The ACLU plans to disseminate to the public the information
gathered through the Request.[2]

---

[2] In addition to the national ACLU offices, there are 53 ACLU affiliate and national
chapter offices located throughout the United States and Puerto Rico. These offices
further disseminate ACLU material to local residents, schools, and organizations through
a variety of means, including their own websites, publications, and newsletters. Further,

Furthermore, the records sought directly relate to a breaking news story of general public interest that concerns actual or alleged Federal government activity; specifically, the records sought relate to the government's treatment and detention of alleged "enemy combatants" now held at Guantánamo, and the alleged abuse and torture of these prisoners while they were in CIA custody. *See* 32 C.F.R. § 286.4(d)(3)(ii)(A); 32 C.F.R 1900.34(c)(2).

The CSRT hearings process generally has received extensive media coverage since it resumed in early March 2007. *See, e.g.* Editorial, *No Justice at Guantanamo*, Newsday (New York), Apr. 7, 2007 at A14 (calling for Congress to revisit the idea of CSRTs); Editorial, *Guantanamo Follies*, New York Times, Apr. 6, 2007 at A18 (condemning the CSRT as a "kangaroo court"); Linda Greenhouse, *Supreme Court Turns Down Detainees' Habeas Corpus Case*, New York Times, Apr. 3, 2007 at A18 (explaining Supreme Court ruling that detainees must exhaust the D.C. Circuit appeals process before challenging CSRTs at the higher court); David G. Savage, *Justices Refuse Detainees*, Los Angeles Times, Apr. 3, 2007 at A12 (same); Linda Greenhouse, *Justices Weigh Opening New Phase on Guantanamo*, New York Times, Mar. 30, 2007 at A24 (describing limited review process open to detainees to challenge their CSRT designations); Adam Liptak, *New Justice System is a Work in Progress*, New York Times, Mar. 29, 2007 at A21 (questioning whether military commissions operate within "the shadow of the law"); Editorial, *The President's Prison*, New York Times, Mar. 25, 2007 § 4 at 11 (questioning reason for secrecy surrounding the CSRTs); Julian E. Barnes, *Secret Hearings for Top 9/11 Suspects*, Los Angeles Times, Mar. 13, 2007 at A11 (describing CSRT process and questioning whether information about detainee mistreatment will be redacted from transcripts); Mike Mount, *Pentagon: Key 9/11 Suspects Face Judges at Gitmo*, CNN, Mar. 12, 2007 (explaining that "it could be weeks before the outcomes [of the CSRT proceedings] are known"); Ben Fox, *U.S. Holds First Hearings for 'High-Value' Inmates*, Associated Press, Mar. 10, 2007 (quoting Associated Press letter of protest that "it would be an unconstitutional mistake to close the [CSRT] proceedings in their entirety"); Carol Rosenberg, *Detainee Hearings to Exclude Reporters*, Orlando Sentinel (Florida), Mar. 9, 2007 at A12 (expressing concern that "national security experts" will "scrub" CSRT transcripts of material of public interest); Julian E. Barnes, *Guantanamo Decision Is Under Fire*, Los Angeles

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

the ACLU makes archived material available at the American Civil Liberties Union Archives, Public Policy Papers, Department of Rare Books and Special Collections, Princeton University Library. ACLU publications are often disseminated to relevant groups across the country, which then further distribute them to their members or to other parties.

Times, Mar. 8, 2007 at A14 (citing criticism by former military lawyers and human rights organizations of Pentagon decision to close CSRT process); Andrew Buncombe, *Trials of Guantanamo Suspects Begin Without a Lawyer or Reporter in Sight*, The Independent (London), Mar. 8, 2007 at 28 (citing claim that CSRTs are "designed to obtain a predetermined result"); Josh White, *Hearing for 14 Guantanamo Detainees to be Held in Secret, Officials Say*, Washington Post, Mar. 7, 2007 at A3 (explaining that current CSRTs are "the first…secret tribunals at Guanatanmo; similar proceeding for hundreds of detainees have been open to the news media"); *Administrative Tribunals to Begin for High-Value Guantanamo Detainees*, Financial Times, Mar. 6, 2007 (revealing defense officials' concerns that even though information presented is unclassified that "detainees, when given the chance to speak, will reveal information relevant to U.S. concerns and activities").

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

There has been particular interest in the hearings of the fourteen prisoners who were previously in CIA custody. *See, e.g.*, Josh Meyer, *Two Key Detainees Deny Terrorism*, Los Angeles Times, Apr. 13, 2007 at A12 (Ammar Al Baluchi, Rjduan Bin Isomuddiiu [Hambali]); Josh White, *Nephew of 9/11 Mastermind Denies Involvement in Attacks*, Washington Post, Apr. 13, 2007 at A11 (Ammar Al Baluchi, Hambali); Editorial, *Guantanamo Follies*, New York Times, Apr. 6, 2007 at A18 (Abd al-Rahim Al Nashiri [Al Nashiri]); *Detainee Alleges Abuse in CIA Prison*, Grand Rapid Press (Michigan), Mar. 31, 2007 at A9 (Al Nashiri); Adam Liptak, *Detainee Says Torture Led to Confessions*, New York Times, Mar. 31, 2007 at A10 (Al Nashiri); Josh Meyer, *Detainee Says Torture Made Him Confess*, Los Angeles Times, Mar. 31, 2007 at A1 (Al Nashiri, Khalid Sheikh Muhammad); Josh White and Ann Scott Tyson, *Detainee Alleges Abuse in CIA Prison*, Washington Post, Mar. 31, 2007 at A1 (Al Nashiri); Josh Meyer, *9/11 Suspect Denied He Served as Paymaster*, Los Angeles Times, Mar. 30, 2007 at A16 (Mustafa Al Hawsawi [Al Hawsawi]); Robert Burns, *Saudi Says He Got Cash from 9/11 Pair*, Star Ledger (New Jersey), Mar. 30, 2007 at 39 (Ramzi Bin al-Shib, Al Hawsawi, Khalid Sheikh Muhammad); *Suspect Denies Sending Money for 9/11*, United Press International, Mar. 30, 2007 (Al Hawsawi*)*; Josh White, *Alleged Sept. 11 Financier Tells Tribunal He Knew Little of Plot*, Washington Post, Mar. 30, 2007 at A2 (Al Hawsawi); Rochelle Riley, Editorial, *In Bush World, Take No Oaths*, Detroit Free Press (Michigan), Mar. 23, 2007 at 11 (Khalid Sheikh Muhammad); Carol Rosenberg, *Guantanamo Captive Apologizes for Bomb*, Miami Herald (Florida), Mar. 23, 2007 (Ahmed Khalfan Ghailani); Adam Liptak, *Qaeda Operative Admits Role in 3 Attacks, Transcript Shows*, New York Times, Mar. 20, 2007 at A10 (Walid Bin Attash, Khalid Sheikh Muhammad); Jerry Seper, *Gitmo Detainee Admits Cole Role*, Washington Times, Mar. 20, 2007 at A5 (Abu Faraj al-Libi, Ramzi Bin Al-Shib, Walid Bin Attash); Josh White, *Al-Qaeda Suspect Says He Planned Cole Attack*, Washington Post,

Mar. 20, 2007 at A1 (Khalid Sheikh Muhammad, Walid Bin Attash);
Laurie Mylroie, *What is Khalid Sheik Mohammed Saying?*, American
Spectator, Mar. 19, 2007 (Abu Faraj al-Libi, Khalid Sheikh Muhammad);
Carol Rosenberg, *Pentagon: Confession in Cole Blast*, Miami Herald
(Florida), Mar. 19, 2007 (Walid bin Attash); *9/11 Architect Confesses*,
Chicago Tribune, Mar. 15, 2007 at 1 (Abu Faraj al-Libi, Ramzi Bin al-
Shib, Khalid Sheikh Muhammad); Adam Liptak, *Suspected Leader of
Attacks on 9/11 is Said to Confess*, New York Times, Mar. 15, 2007 at A1
(Khalid Sheikh Muhammad); Ed Pilkington, *'I was Responsible for 9/11,
from A to Z,'* The Guardian (London), Mar. 15, 2007 (Khalid Sheikh
Muhammad); Carol Rosenberg, *Hearings Start Today in Secret*, Miami
Herald (Florida), Mar. 9, 2007 (Khalid Sheikh Muhammad).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Moreover, many recent accounts express concern that at least some
of these individuals have been tortured or subjected to interrogation
techniques that are prohibited by international and United States Law. *See,
e.g.*, Colin Freeze, *'High-Value' Detainee Rejects al-Qaeda doctrine*,
Globe and Mail (Canada), Apr. 17, 2007 at A5 (reporting that Abu
Zubaydah was subject to waterboarding); *Prisoner Denies Al-Qaida Link*,
Newsday (New York), Apr. 17, 2007 at A37 (noting that Abu Zubaydah
claimed to have made false confessions while being tortured); *U.S. Says
Detainee Admitted Plotting Cole, Embassy Attacks*, Star Ledger (New
Jersey), Mar. 20, 2007 at 5 (acknowledging public questions about validity
of the high value detainees' confessions under the influence of torture);
Josh White, *Al-Qaeda Suspect Says He Planned Cole Attack*, Washington
Post, Mar. 20, 2007 at A1 (pointing out impossibility of knowing whether
the detainees' confessions were influenced by past torture); Ed Pilkington,
*'I was Responsible for 9/11, from A to Z,'* The Guardian (London), Mar.
15, 2007 (describing use of waterboarding and other harsh interrogation
techniques against Khalid Sheik Muhammad); Warren P. Strobel,
*Pentagon Set to Begin Hearing for 14 Detainees*, Knight Ridder, Mar. 6,
2007 (noting that questions have been raised about the detainees' torture
during CIA detention); Mark Mazzetti, *Pentagon Revises Its Rules on
Prosecution of Terrorists*, New York Times, Jan. 19, 2007 at
A18(reporting that many of the detainees may have been subject to
interrogation methods like waterboarding); Josh Meyer and Greg Miller,
*The Prisoner Problem*, Los Angeles Times, Sept. 7, 2006 at A1 (noting
that unnamed officials have confirmed that the "alternative" interrogation
procedures used by the CIA with the detainees included waterboarding).

Some reports also suggest that the government is improperly
concealing allegations of torture and mistreatment by detainees by
redacting such allegations from the hearing transcripts. *See, e.g.*, William
Glaberson, *Detainee Denies Membership in Al Qaeda*, New York Times,
Apr. 17, 2007 at A12 (reporting that Zabaydah's response to question
about his treatment was redacted); Carol Rosenberg, *Detainee Denies*

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

*Allegiance to Bin Laden*, Miami Herald (Florida), Apr. 16, 2007
(characterizing Zabaydah's "censored" transcript as containing details
about his torture by CIA agents); Adam Liptak, *Detainee Says Torture Led
to Confessions*, New York Times, Mar. 31, 2007 at A10 (noting that
following a question during Al Nashiri's hearing about the methods of
torture used against him, "the four-paragraph passage…was redacted in
six places"); Josh Meyer, *Detainee Says Torture Made Him Confess*, Los
Angeles Times, Mar. 31, 2007 at A1 (stating that details of Al Nashiri's
torture were not included in his CSRT transcript and that his claims
"appear to be redacted by U.S. government censors"); Josh White and Ann
Scott Tyson, *Detainee Alleges Abuse in CIA Prison*, Washington Post,
Mar. 31, 2007 at A1 (pointing out that portions of Al Nashiri's transcript
that appear to describe his torture were redacted); *9/11 Architect
Confesses*, Chicago Tribune, Mar. 15, 2007 at 1 (noting that portions of
Khaled Sheikh Muhammad's transcript were deleted, including his
response to a question about torture); Adam Liptak, *Suspected Leader of
Attacks on 9/11 is Said to Confess*, New York Times, Mar. 15, 2007 at A1
(suggesting that allegations of mistreatment were redacted from hearing
transcript); *see also*, Editorial, *Top-Secret Torture*, Washington Post, Nov.
21, 2006 (arguing that the government's attempt to classify harsh
interrogation techniques used against detainees makes its accountability
impossible); Carol D. Leonnig and Eric Rich, *U.S. Tries to Muzzle
Detainees About Interrogation Methods*, Washington Post, Nov. 4, 2006 at
A24 (reporting the Bush administration's attempt to keep detainees from
revealing the "alternative interrogation methods").

The requested records are urgently needed within the meaning of
the applicable regulations in order to provide the public with information
about the treatment and detention of prisoners in U.S. custody. 32 C.F.R. §
286.4(d)(3)(ii); 32 C.F.R. 1900.34(c)(2). The records requested are not
sought for commercial use and the requesters plan to disseminate the
information disclosed as a result of this FOIA request to the public at no
cost.

### Application for Waiver or Limitation of Fees

We request a waiver of processing fees on the grounds that
disclosure of the requested records is in the public interest because it is
likely to contribute significantly to public understanding of the operations
or activities of the government and is not primarily in the commercial
interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii); 32 C.F.R. §
286.28(d); 32 C.F.R. 1900.13(b)(2).

Numerous news accounts reflect the considerable public interest in
the records we seek. *See* cited articles, *supra*. Given the ongoing and
widespread media attention to this issue, the records sought in the instant

Request will significantly contribute to public understanding of the operations and activities of the DoD and the CIA. 32 C.F.R. § 286.28(d); 32 C.F.R. 1900.13(b)(2). Moreover, as stated above, disclosure is not in the ACLU's commercial interest. Any information disclosed by the ACLU as a result of this FOIA request will be available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'" (citation omitted)).

We also request a limitation of document reproduction fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. Accordingly, fees associated with the processing of the Request should be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II); 32 C.F.R. § 286.28(e)(7); 32 C.F.R. § 1900.13(i)(2).[3]

The ACLU meets the statutory and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *National Security Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989); *cf. ACLU v. Dep't of Justice*, 321 F. Supp. 2d at 30 n.5 (finding non-profit public interest group to be "primarily engaged in disseminating information"). The ACLU is a "representative of the news media" for the same reasons it is "primarily engaged in the dissemination of information." *See Electronic Privacy Information Ctr. v. Dep't of Defense*, 241 F. Supp. 2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA).[4]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[3] In the case of DoD, we also seek a waiver of duplication fees. 32 C.F.R. § 286.28(e)(7). For the reasons described above, disclosure of the information sought is in the public interest and is likely to contribute significantly to public understanding of the operations or activities of the government. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II); 32 C.F.R. § 286.28(e)(7).

[4] On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU. For example, in May 2005, the United States Department of Commerce granted a fee waiver to the ACLU with respect to its request for information regarding the radio frequency identification chips in United States passports. In March 2005, the Department of State granted a fee waiver to the ACLU with regard to a request submitted that month regarding the use of immigration laws to exclude prominent non-citizen scholars and intellectuals from the country because of their political views, statements, or associations. Also, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in August of 2004. In addition, the Office of Science and Technology Policy

\*     \*     \*

Pursuant to applicable statute and regulations, we expect the determination regarding expedited processing within 10 calendar days. *See* 5 U.S.C. § 552(a)(6)(E)(ii)(I); 32 C.F.R. § 286.4(d)(3); 32 C.F.R. 1900.34(c).

If the Request is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions to FOIA. We expect the release of all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Jameel Jaffer
> American Civil Liberties Union
> 125 Broad Street, 18th Floor
> New York, NY 10004

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Sincerely,

JAMEEL JAFFER

---

in the Executive Office of the President said it would waive the fees associated with a FOIA request submitted by the ACLU in August 2003. In addition, three separate agencies – the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice – did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

8

**EXHIBIT B**

Central Intelligence Agency



Washington, D.C. 20505

MAY 0 4 2007

Mr. Jameel Jaffer
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

Reference: F-2007-01226

Dear Mr. Jaffer:

The office of the Information and Privacy Coordinator has received your 20 April 2007 Freedom of Information Act (FOIA) request for:

> **"the following records relating to the hearings of Abu Faraj al-Libi; Walid Bin Attash; Khalid Sheikh Muhammad; Ramzi Bin al-Shib; Ahmed Khalfan Ghailani; Mohd Farik bin Amin 'Zubair'; Mustafa Al Hawsawi; Al Nashiri, Abd Al Rahim Hussein Mohammed; Bashir Bin Lap (AKA Lillie); Ammar Al Baluchi; Rjduan Bin Isomuddiiu (AKA Hambali); Zayn Al Abidin Muhammad Husayn (AKA Zubaydah); Majid Khan; and Gouled Hassan Dourad before the Combatant Status Review Tribunals ('CSRT') at the U.S. Naval Base, Guantánamo Bay, Cuba ('Guantánamo'):**
>
> **1. Unredacted versions of CSRT hearing transcripts.**
> **2. Copies of all records provided to the CSRT by the detainees or their Personal Representative.**
> **3. Copies of all records provided to the CSRT by the Recorder."**

We have assigned your request the reference number above. Please use this number when corresponding so that we can identify it easily.

We accept your request; it will be processed in accordance with the FOIA, 5 U.S.C. § 552, as amended, and the CIA Information Act, 50 U.S.C. § 431, as amended. Unless you object, we will limit our search to CIA-originated records existing through the date of

this acceptance letter.  We are granting your request for expedited processing, and, as a matter of administrative discretion, no fees will be charged for this request.

Despite our best efforts, the large number of FOIA requests CIA receives has created unavoidable processing delays making it unlikely that we can respond within the 20 working days the FOIA requires.  We will nonetheless process your request as quickly as we can consistent with its expedited status.

You have the right to consider our honest appraisal as a denial of your request and you may appeal to the Agency Release Panel.  A more practical approach would permit us to continue processing your request and respond to you as soon as we can.  You will retain your appeal rights and, once you receive the results of our search, can appeal at that time if you wish.  We will proceed on that basis unless you object.

Sincerely,

Scott Koch
Information and Privacy Coordinator